UNITED STATES of America,

v.

Henry G. BARR, Appellant.

No. 91–5486.

United States Court of Appeals,
Third Circuit.

Argued Nov. 19, 1991.

Decided May 15, 1992.

Rehearing and Rehearing In Banc
Denied June 24, 1992.

Gordon A.D. Zubrod (argued), Office of U.S. Atty., Harrisburg, Pa., William J. Corcoran, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for appellee.

Charles F. Scarlata, Ellen M. Viakley (argued), Scarlata & Plastino, Pittsburgh, Pa., for appellant.

Before: MANSMANN, COWEN and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

Henry G. Barr appeals to this court the judgment of conviction and sentence entered in the district court on May 30, 1991. Barr was indicted on August 10, 1990, by a federal grand jury sitting in Harrisburg, Pennsylvania. The indictment charged Barr with making a false written statement in violation of 18 U.S.C. § 1001 (1988) (Count One); a false oral statement in violation of 18 U.S.C. § 1001 (1988) (Count Two); conspiracy to possess cocaine in violation of 21 U.S.C. § 846 (1988) (Count Three); and possession of cocaine in violation of 21 U.S.C. § 844 (1988) (Count Four). At his arraignment on August 22, 1990, Barr entered a plea of not guilty. His trial began on February 4, 1991. On February 7, the jury returned a verdict of guilty on all counts.

The district court sentenced Barr to a term of sixteen months imprisonment on Counts One and Two, and twelve months imprisonment on Counts Three and Four, to be served concurrently. Following this period of incarceration, Barr was sentenced to a two-year term of supervised release. A fine of $2,500 was also imposed for each of the counts.

On June 6, 1991, Barr appealed his conviction and sentence to this court. We have jurisdiction of this appeal pursuant to 18 U.S.C. § 3231 and 28 U.S.C. § 1291. Barr cites eight grounds for the appeal: (1) the false statements charged in Counts One and Two fall within the "exculpatory no" doctrine, and so cannot provide a basis for conviction under 18 U.S.C. § 1001; (2) there was a fatal variance between Count Three of the indictment, which charged a single conspiracy to possess cocaine, and the proof at trial, which demonstrated multiple conspiracies; (3) the evidence was not sufficient to establish beyond a reasonable doubt that the substance in question in Count Four was cocaine; (4) Count Two of the indictment was multiplicitous; (5) the district court erred in denying discovery of documents relevant to the claim of selective prosecution; (6) Count Four should have been severed from the other three counts; (7) the district court's upward departure of four guideline levels in sentencing Barr was in violation of federal law; and (8) the district court erred in failing to adjust Barr's sentence for acceptance of responsibility.

After considering each of Barr's first six grounds for appeal, we find them to be without merit. We will discuss in detail two of these grounds, the "exculpatory no" doctrine, and the question of whether the proof under Count Three demonstrated

multiple conspiracies, rather than a single conspiracy, to possess cocaine. With regard to the sentencing claims, we reject Barr's argument that the district court erred in failing to adjust Barr's sentence for acceptance of responsibility. For the reasons we will set forth below, however, we conclude that the district court in sentencing Barr failed to give him the requisite notice of its intent to depart from the sentencing guidelines. Consequently, we will vacate Barr's sentence and remand the case to the district court for resentencing.

### The Relevant Facts of Record.

The relevant facts may be summarized as follows. From September 6, 1988, to May 12, 1989, Henry Barr served as an Assistant to the Attorney General of the United States in Washington, D.C. In this position Barr acted as a liaison with law enforcement agencies and carried out assignments, given to him by the Attorney General, which related to pending matters within the criminal and intelligence communities. In addition, Barr was responsible for briefing the Attorney General on Foreign Intelligence Security Act cases. Consequently, Barr had access to sensitive information relating to intelligence and law enforcement areas.

Before assuming his duties as Assistant Attorney General, Barr completed Standard Form 171, entitled "Application for Federal Employment." This form includes questions concerning prior criminal convictions but does not address any uncharged or unadjudicated criminal conduct. In addition, persons appointed to sensitive positions in the Department of Justice are usually required to complete Standard Form 86 (SF–86) prior to taking the position. This form includes specific questions concerning the applicant's drug use and offers a warning to the applicant that failure to provide truthful answers could result in criminal prosecution. At the Attorney General's request, the Security Officer of the Department of Justice granted Barr an interim or temporary security clearance, pending the completion of his full-field background investigation. Barr completed the SF–86 form six days after entering on duty as Assistant to the Attorney General.

In response to the SF–86 question, "Do you now use or supply, or within the last 5 years, have you used or supplied marijuana, cocaine, narcotics, hallucinogenics, or other dangerous or illegal drugs?", Barr typed an "X" beneath the word "no." Barr signed the SF–86, certifying that his answers were true.

On November 1, 1988, Barr was interviewed in Washington, D.C., by a Special Agent of the Federal Bureau of Investigation. The Special Agent reviewed the specific questions on the SF–86, and asked Barr if he had ever used illegal drugs. Barr responded that he had not. The Security Officer relied upon Barr's answers recorded on the SF–86 in deciding to grant a temporary clearance. The Security Officer further relied upon the statements made by Barr in his interview with the FBI special agent in granting Barr a final security clearance.

Barr remained at the Department of Justice for approximately nine months. On April 27, 1989, he submitted a letter of resignation to the Attorney General, citing his desire to return to his family in Pennsylvania. The resignation was effective May 12, 1989.

After Barr had left the Department of Justice, information that he had used illegal drugs, specifically cocaine, was disclosed during a federal grand jury investigation into drug use by public officials in Pennsylvania. The evidence indicated that Barr had used cocaine in the years 1984 through 1988, and on at least one occasion in 1989, during his employment as Assistant to the Attorney General. Ultimately, in addition to Barr, two former public officials were charged with drug activities as a consequence of this investigation: Richard L. Guida, former Executive Deputy Attorney General for the Commonwealth of Pennsylvania, and W. Michael Trant, former Deputy Attorney General in charge of legislative liaison for the Pennsylvania Attorney General's Office. Other private citizens were also prosecuted.

At Barr's trial, then-Attorney General Richard Thornburgh testified that, had he known of Barr's past cocaine use, he would not have made Barr part of his staff. The Director of Security for the Department of Justice testified that he would not have approved Barr's interim security clearance and would not have recommended final clearance if he had been aware of Barr's past cocaine use. Testimony was also presented concerning Barr's duties within the Department of Justice. Five other witnesses testified that they had used cocaine with Barr on various social occasions from 1984 to 1989. On February 7, 1991, the jury returned a guilty verdict on all counts.

On May 30, 1991, Barr appeared before the district court for sentencing. The court found that an aggravating circumstance existed which had not adequately been taken into consideration by the Sentencing Commission in formulating the sentencing guidelines, specifically that Henry Barr had held a high-ranking position within the Department of Justice and that criminal activity by public officials tended to erode public confidence in government. As a result, the court concluded that an upward departure of four levels to a guideline range of 10–16 months was appropriate. Barr was sentenced to 16 months imprisonment on both of the felonies and to 12 months imprisonment on both of the misdemeanors, all sentences to run concurrently.

## I. THE "EXCULPATORY NO" DOCTRINE.

Counts One and Two of the indictment charged Barr with making a false written statement and a false oral statement to the government in violation of 18 U.S.C. § 1001. The underlying false statements are based on Barr's negative replies to questions concerning his illegal drug use, made both on the Department of Justice Standard Form 86 and in response to the November 1, 1988, questioning by the FBI Special Agent.

■ A conviction under § 1001 requires that five elements be proved: (1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction.[1] *See United States v. Herring,* 916 F.2d 1543, 1546 (11th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991). Barr does not contend that the Government failed to prove any of these elements, but rather argues that his denials of possession and use of illegal drugs, charged in Counts One and Two as false statements in violation of 18 U.S.C. § 1001, do not provide a basis for conviction under that statute. According to Barr, these denials are encompassed within the "exculpatory no" doctrine, which provides a defense to prosecution under § 1001 if the statements at issue amount to no more than a denial of criminal conduct in response to investigatory questioning by the government.

■ This court has neither adopted nor rejected the "exculpatory no" doctrine.[2] Thus, we find a review of this doctrine as developed by our sister circuits instructive with regard to the case before us.

■ The "exculpatory no" doctrine is a judicially created exemption from prosecution under 18 U.S.C. § 1001 for certain negative exculpatory responses to questions posed by investigating government agents. *See United States v. Berisha,* 925 F.2d 791, 796 (5th Cir.1991); *United States v. Holmes,* 840 F.2d 246, 249 (4th Cir.), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988). This doctrine, first articulated in *United States v. Stark,* 131 F.Supp. 190 (D.Md.1955), has more recently been described as an exception, which ex-

---

**1.** *18 U.S.C. § 1001 states:*

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** No circuit has rejected the "exculpatory no" doctrine directly. *See* Comment, *False Statements To Federal Agents: Induced Lies And The Exculpatory No,* 57 U.Chi.L.Rev. 1273 (1990).

cludes from the definition of "statements" under § 1001 "mere exculpatory denials" made during government investigations. *See United States v. White,* 887 F.2d 267, 273 (D.C.Cir.1989). The purpose of the "exculpatory no" doctrine has been explained as follows: "section 1001 plays an important role in protecting the effectiveness of government agencies whose functions require them to rely on the accuracy of the information they receive. The statute, however, was not intended to compel persons suspected of crimes to assist criminal investigators in establishing their guilt." *United States v. Cogdell,* 844 F.2d 179, 185 (4th Cir.1988).

The Ninth Circuit Court of Appeals has developed five conditions it deems must be met in order for the "exculpatory no" doctrine to be invoked as a defense to a charge brought under § 1001:

(1) The false statement must be unrelated to a privilege or claim against the government;

(2) the false statement must have been made in response to *inquiries initiated by an agency of the federal government;*

(3) the false statement must not impair the basic functions entrusted by law to the inquiring agency;

(4) the inquiries must not have been part of a regular exercise of administrative responsibility; and

(5) a truthful response would have incriminated the declarant.

*United States v. Myers,* 878 F.2d 1142, 1143–44 (9th Cir.1989) (citing *United States v. Becker,* 855 F.2d 644, 646 (9th Cir.1988)) (emphasis added). *See also United States v. Taylor,* 907 F.2d 801, 805–06 (8th Cir. 1990) (applying the Ninth Circuit's five-factor test); *Cogdell,* 844 F.2d at 183 (stating that the five-factor test articulated by the Ninth Circuit appropriately balances the considerations implicated in applying the "exculpatory no" doctrine to a § 1001 prosecution).[3] These factors are listed in the conjunctive; thus, the failure to meet any one of them renders the "exculpatory

no" doctrine unavailable to the accused. *Myers,* 878 F.2d at 1144.

Other circuits, while not explicitly endorsing this structured five-factor test, have emphasized that a defendant's ability to invoke this doctrine, and so avoid prosecution under § 1001, turns on whether the negative exculpatory denials were made in response to questions in an investigative, rather than an administrative, proceeding. *See White,* 887 F.2d at 273–74 (noting that this doctrine "does not shield from prosecution under section 1001 false responses to questions in an administrative rather than investigative proceeding."); *United States v. Morris,* 741 F.2d 188, 191 (8th Cir.1984) (noting, in declining to adopt this doctrine, that it does not apply to a routine administrative inquiry); *United States v. Hajecate,* 683 F.2d 894, 900 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983); *United States v. Fitzgibbon,* 619 F.2d 874, 880 (10th Cir.1980); *cf. United States v. Payne,* 750 F.2d 844, 863 n. 21 (11th Cir.1985) (rejecting the administrative/investigative distinction in applying the "exculpatory no" doctrine to 18 U.S.C. § 1006, in part because "this distinction is based on the legislative intent behind 18 U.S.C. § 1001"). *But see Steele,* 933 F.2d at 1321 (rejecting the administrative/investigative distinction as "unwarranted").

The idea that the government should not "be allowed to coerce a person into admitting wrongdoing, on pain of prosecution," also has been advanced in support of this doctrine. *Payne,* 750 F.2d at 862. *See also United States v. Lambert,* 501 F.2d 943, 946 n. 4 (5th Cir.1974) ("Undoubtedly the judicial gloss put on § 1001 by the "exculpatory no" decisions originates at least in part from latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment.").

The protection from self-incrimination afforded by the "exculpatory no" doctrine, however, must be balanced against the fact that § 1001 was drafted by Congress in an expansive fashion to promote the "valid

---

**3.** *But see United States v. Steele,* 933 F.2d 1313, 1320–21 (6th Cir.) (rejecting the Ninth Circuit's five-factor test as over-broad), *cert. denied,* —— U.S. ——, 112 S.Ct. 303, 116 L.Ed.2d 246 (1991).

legislative interest in protecting the integrity of official inquiries." *United States v. Rodgers*, 466 U.S. 475, 479–80, 104 S.Ct. 1942, 1946–47, 80 L.Ed.2d 492 (1984) (quotation and citation omitted). Indeed, in invoking this doctrine, courts necessarily balance "the need for protecting the basic functions of government agencies with the concern that a criminal suspect not be forced to incriminate himself in order to avoid punishment under section 1001." *United States v. Cogdell*, 844 F.2d 179, 183 (4th Cir.1988).

■ As noted above, this court has not taken a position on the "exculpatory no" doctrine. We conclude, however, that, given the facts of this case, Barr would not be able to invoke this doctrine, as it has been interpreted in other circuits, as a defense to the violations of 18 U.S.C. § 1001 charged in Counts One and Two of his indictment. Moreover, because we decline to apply the "exculpatory no" doctrine to the facts of this case, we need not decide whether the doctrine is viable under other circumstances. *See Steele*, 933 F.2d at 1315.

An examination of the facts before us demonstrates why the elements necessary to invoke the doctrine do not exist here. Barr contends that he is entitled to the exemption from prosecution provided by this doctrine because he made the false statements "in response to inquiries initiated by an agency of the federal government." He points to the indictment, which charged that after assuming his duties, he was *required* to submit to the investigation. Further, Barr alleges that the statements in question were unrelated to a claim or privilege against the United States because he "did not ask for a security clearance."

We find this argument to be without merit. We agree with the Government's assertion that Barr himself made the decision either "to secure or accept a prestigious appointment with the Office of the Attorney General of the United States." The questions regarding drug use and Barr's resulting false denials were the direct result of his decision to accept employment with the government as Assistant to the Attorney General. Thus, in effect, Barr himself precipitated the background investigation that led to his false denials of illegal drug use. The policy underlying the judicial creation of the "exculpatory no" doctrine, that of limiting the government's ability to coerce individuals suspected of wrong-doing into self-incrimination during the course of governmental investigations, certainly would not be advanced through protecting persons from prosecution under § 1001 who, like Barr, make false statements in connection with their quest for government employment. *See United States v. Taylor*, 907 F.2d 801, 804 (8th Cir.1990) (explaining the rationale for the "exculpatory no" doctrine: "under certain circumstances, the government may not prosecute an individual for false or fraudulent statements which were made in response to questioning *initiated by the government* where a truthful statement would have incriminated the defendant.") (citation omitted) (emphasis added); *United States v. Bush*, 503 F.2d 813, 818 (5th Cir.1974) (explaining "that there is a valid distinction between negative exculpatory denial of a suspected misdeed and an affirmative representation of the facts peculiarly within the knowledge of the suspect not otherwise obtainable by the investigator."). Thus we conclude that Barr cannot rely upon the "exculpatory no" doctrine to evade conviction under 18 U.S.C. § 1001 for the false statements charged in Counts One and Two of his indictment.

## II. CONSPIRACY VARIANCE.

■ Count Three of Barr's indictment charged a single conspiracy to possess cocaine, beginning in December, 1984, and ending in January of 1988. Barr contends that because each of his alleged co-conspirators denied the existence of an ongoing agreement, the evidence adduced at trial was insufficient as a matter of law to prove the single conspiracy charged. Thus, Barr argues, his conviction under Count Three should be vacated, and a judgment of acquittal entered. The Government counters that "Barr's pervasive involvement with co-conspirators and his possession of cocaine

is sufficient to support an inference that he was aware of an ongoing conspiracy and voluntarily associated himself with it."

■ We must vacate a conviction if there is a "variance" between the indictment and the proof at trial, to the prejudice of the defendant's substantial rights. *United States v. Salmon*, 944 F.2d 1106, 1116 (3d Cir.1991) (citing *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990)), *cert. denied*, —— U.S. ——, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992). If "a single conspiracy has been alleged, a variance of proof occurs if the evidence shows merely multiple conspiracies." *Id.* *See also Kotteakos*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). This "variance doctrine" is designed to protect a defendant from being tried *"en masse* for the conglomeration of distinct and separate offenses committed by others." *Id.* (quoting *Kelly*, 892 F.2d at 258). The doctrine is intended to prevent a situation in which the jury might "be unable to separate offenders and offenses and easily could ... transfer [ ] the guilt from one alleged co-schemer to another." *Id.* (quoting *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir.1982)). In attempting to distinguish single from multiple, conspiracies the Second Circuit, for example, has defined multiple conspiracies as "separate networks operating independently of each other." *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir.1982).

■ To determine whether, under the facts of this case, an impermissible variance has occurred, we must review the record in the light most favorable to the government in order to ascertain if a reasonable jury could find the existence of a single conspiracy. *Id.* (citing *Kelly*, 892 F.2d at 258; *United States v. Di Pasquale*, 740 F.2d 1282, 1292 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985)). This court has developed a three-step inquiry to aid such a determination:

First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.

*Salmon*, 944 F.2d at 1116 (citing *Kelly*, 892 F.2d at 259) (quotations and citations omitted).

Testimony on the conspiracy charge was presented at Barr's trial by five government witnesses, summarized below. Construing this testimony in the light most favorable to the government, we conclude that a reasonable jury could find the existence of a single conspiracy to possess cocaine.

### 1. Richard Guida.

Guida testified that James Diebold supplied him with cocaine, App. at 254, and that Diebold also supplied Barr with cocaine. App. at 272. Guida described the procedure through which he obtained the cocaine as follows:

> I would either have talked to Jim prior to the weekend, or he would call me, and if he was going to get something for himself, I would make an arrangement that he would pick up something for me also. And then I would go—normally over to his house. It was always—almost always be on a Friday evening and pick it up.

App. at 271. Guida stated that he once ran into Barr at Diebold's house. On that occasion Barr was picking up a package that looked "very similar" to Guida's cocaine package. App. at 272.

Guida testified that there were several occasions when he met Barr socially, including a "number of occasions" at Barr's house, when he and Barr used cocaine. App. at 263, 267, 270, 273. Further, Guida stated he specifically remembered being with Debra Cron at Barr's house when Barr used cocaine, because he "thought it was unusual for Hank [Barr] to have used

a controlled substance around somebody he didn't know." App. at 268.

On cross examination, Guida testified that there was no agreement between him and Barr with respect to sharing cocaine. App. at 284. He also stated that each use of cocaine was a separate and independent event, App. at 284, that he had no ongoing long-term agreement with Barr concerning the use or possession of cocaine, and that he had no agreement with Barr to conceal the usage from others. App. at 285.

2. James Diebold.

Diebold testified that he remembered using cocaine with Barr in 1984, App. at 342, and "that from sometime early to middle 1985, up until maybe late summer of 1986, there were occasions at my house where I'd used cocaine with Henry Barr." App. at 343. After February or March of 1987, he estimated that he shared cocaine with Barr on two or three occasions. App. at 349. Diebold also testified that on several occasions Guida would call him requesting him to obtain cocaine for them to split, and that on several occasions Barr accompanied Guida to Diebold's house, and the three would split the cocaine. App. at 343–44. On these occasions, the three would divide the costs of the cocaine. App. at 344. When Guida was not present, Diebold testified that he provided the cocaine to Barr "gratuitously." App. at 346.

Diebold further stated that in August of 1988 he had a conversation with Barr "about some of the things that might accompany [Barr's] taking a position such as [Assistant Attorney General], i.e., polygraph, urinalysis, et cetera." App. at 359.

When cross-examined, Diebold stated: "My feeling in regards to each and every event with regard to the use of cocaine, as has been discussed, was that each was an isolated incident, spontaneous and, in my view, without any connection to past and future uses." App. at 397.

3. Melinda Reese.

Reese testified that she dated Guida for a period of two and a half years. App. at 426. She testified that she remembered seeing Barr use cocaine approximately five times at Guida's home, Barr's home, and her own home. App. at 430. When asked if there was a pattern to the cocaine use among herself, Guida, Barr, Barr's wife, and Diebold, Reese responded:

"It was done in the privacy of our homes among a small group of people. And then, at some point, Rick [Guida] started to pick up women. He would bring them. I think that was part of his problem.

. . . . . .

These women weren't necessarily long-term girlfriends, and I think they probably talked."

App. at 436.

On cross examination, Reese testified that she never overheard Barr and Guida enter into an agreement to use cocaine, App. at 453, and that there was no pattern to the cocaine use of Guida, the Barrs, and herself. App. at 453. Reese also stated that, with regard to Barr in particular, each cocaine use was a separate incident. App. at 454.

4. John Connelly.

Connelly testified that he used cocaine with Barr and Diebold on one occasion in 1985. App. at 468. Connelly referred to this use as "no big deal." App. at 469.

When cross-examined, Connelly stated that there was no connection between that incident and any other time that he used cocaine, that he was not privy to any ongoing agreement to use cocaine, and that there was no agreement to hide and use cocaine. App. at 471.

5. Debra Cron.

Cron testified that she dated Guida for a period of six months in 1985. App. at 474. She testified that in June of 1985 she and Guida went to Barr's house and used cocaine with Barr and his wife. Cron stated that she and Guida went to Barr's house again a few weeks later, and again used cocaine. App. at 479–80.

On cross-examination, Cron testified that the first incidence of cocaine use with Barr had not been planned, that there was no connection between that use and the second incident, and that she was not privy to any ongoing agreement to use cocaine. App. at 487.

We find that each step of the three-part inquiry developed by this court to aid in the variance determination supports the jury's finding of a single conspiracy.

First, both Guida and Diebold recounted the procedure through which Diebold would supply Barr and Guida with cocaine. Diebold explained that the three would often divide the cost of the cocaine. Furthermore, each of the government witnesses detailed a variety of occasions on which he or she shared cocaine with Barr. Thus the evidence adduced at trial supports a conclusion that there was a common goal among Barr and the government witnesses to possess cocaine.

Second, based on the testimony, a reasonable jury could conclude that the agreement "contemplated bringing about a continuous result that would not continue without the continuous cooperation of the conspirators." In particular, with regard to James Diebold, Richard Guida, and Barr, the "pattern" of cocaine use described at trial is capable of supporting a reasonable inference that they had entered into a tacit understanding to continue their practice of jointly obtaining and using cocaine. *See United States v. Brown*, 739 F.2d 1136, 1142 (7th Cir.) (stating "It is well settled that a written or spoken agreement among alleged co-conspirators is unnecessary; rather, indirect evidence of '[a] mere tacit understanding will suffice.' ") (quoting W. LaFave and A. Scott, Jr. *Handbook on Criminal Law* § 61, at 461 (1972)), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984). This inference is reinforced by Mr. Guida's testimony that it was unusual for Barr to use a controlled substance in the presence of someone that he did not know; and by Ms. Reese's testimony that there was a pattern of using cocaine in the privacy of their homes and among a small group of people, and that a problem arose when Guida brought strangers into that group.

Third, the witnesses at trial presented an extensive list of occasions, ranging from major holidays and planned celebrations to informal get-togethers and chance meetings, on which they used cocaine with Barr. Based on this testimony adduced at trial, a reasonable jury could find the requisite overlap in the parties' possession and use of cocaine.

Thus, viewing the evidence in the light most favorable to the government, we conclude that a reasonable jury could have found the existence of the single conspiracy charged in the indictment.

■ Barr also argues that the district court improperly refused his request for a jury charge on multiple conspiracies. At Barr's trial, the court set forth its rationale for refusing these proposed points of charge. The trial judge explained that he had determined that there was a single conspiracy and that charging multiple conspiracies would only confuse the jury. He went on to state:

The jury's choice then, is: Is there a conspiracy, or isn't there a conspiracy.

App. at 523–24.

Our review of the record has led us to the same conclusion. Because the evidence did not demonstrate either the existence of separate independent networks or that it was likely that the jury would not be able to separate the offenders and the offenses, we find that the trial judge properly refused to give the multiple conspiracy instruction.

■ Moreover, even if a multiple conspiracies charge should have been given, reversal on appeal is *not* automatic. *United States v. Alkins*, 925 F.2d 541, 554 (2d Cir.1991). To justify reversal, the appellant must "demonstrate both the likelihood of multiple conspiracies having existed, and substantial prejudice resulting from the failure to give the requested charge." *Id.* (quoting *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir.1982)). As proof of prejudice, Barr points to the fact that the jury returned on three occasions after the initial

charge to ask the court to re-read the definition of conspiracy. In fact, the jury had only two questions concerning this definition. A little over an hour after it had begun deliberating, the jury sent in a note with two questions, the first stating: "Jury would like to have a legal definition of conspiracy as it pertains to this case." App. at 653. In response, the court repeated its earlier instruction on conspiracy. Just over an hour later, shortly before they arrived at their verdict, the jury requested that the definition of conspiracy be read again "slowly" since some jurors had been distracted by commotion in the back of the courtroom when it was repeated before. App. at 658.

We find it an unwarranted leap of logic to infer from these two jury questions either that the jury was confused by a failure of the court to instruct on multiple conspiracies or that Barr was substantially prejudiced by the court's decision not to do so. The logical inference to be drawn from these questions is in fact the issue posited by the trial judge; namely, the jury was attempting to determine whether or not there was a conspiracy. Even if we were to conclude, therefore, that the district court erred in denying Barr's request, Barr's argument on appeal must nevertheless fail, because he has not demonstrated the requisite substantial prejudice.

## III. SENTENCING GUIDELINE DEPARTURE.

The last issue in Barr's appeal which we will discuss at length is the sentence imposed. At the sentencing hearing, the district court departed upward four levels on the basis of what it found to be an aggravating circumstance not adequately taken into consideration by the Sentencing Commission: "the fact that Henry Barr held a high ranking position with the Department of Justice and that criminal activity by public officials tends to erode public confidence in government." App. at 724.

Barr challenges this departure as violating federal law on several grounds. He argues that the four level upward departure cannot be supported by the record,

because (1) issues relating to conduct affecting the public trust have already been taken into consideration by the guidelines, (2) the "aggravating circumstance" requisite for departure under the sentencing guidelines did not exist on the facts of this case, (3) the court did not give notice of its intention to depart as mandated by the Supreme Court in *Burns v. United States*, —— U.S. ——, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), and (4) the degree of departure cannot be deemed reasonable.

The procedure for our review of sentencing departures is well-established. District courts are required to impose a sentence within the applicable guideline range unless they find "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *United States v. Kikumura*, 918 F.2d 1084, 1098 (3d Cir.1990) (quoting 18 U.S.C. § 3553(b) (1988)). If a district court bases its decision to depart on a circumstance that has been adequately considered by the sentencing commission in formulating the guidelines, the departure must be reversed on appeal. *Id.* (citing 18 U.S.C. § 3742(f)(1) (1988)). Appellate review of this issue is plenary. *Id.* (citing *United States v. Ryan*, 866 F.2d 604, 610 (3d Cir.1989)). In determining whether a circumstance has been adequately taken into consideration by the sentencing guidelines, a court "shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b).

We will begin our consideration of this question by examining the documents prepared for the sentencing both by the Probation Office and by the parties.

To assist the Probation Officer in his preparation of the Presentence Report, the defendant submitted Defendant's Version of the Offense, App. at 744–74, and the U.S. Attorney submitted a Sentencing Memorandum, App. at 776–83. The defendant's submission focused on acceptance of responsibility and, in fact, the original Pre-

sentence Report awarded Barr a two level reduction in offense level for acceptance of responsibility. App. at 736, ¶ 36. The defendant made no mention in this memorandum of any departure from the guidelines, either up or down.

The U.S. Attorney in his Sentencing Memorandum noted:

> It is the position of the United States that the defendant abused a position of public trust in a manner which significantly facilitated the commission or concealment of the offense. As was testified to at trial, Henry Barr was brought in under a special exemption by the Attorney General. That special exemption and his high position of public trust caused the Security Office of the Department of Justice to give great deference to his representations where most applicants are thoroughly investigated *prior* to granting them any access to national security information. Thus, Barr's position of public trust significantly facilitated the concealment of the offense, thereby warranting an increase in his guideline level by two additional levels.[4]

App. at 782. The U.S. Attorney then recommended, "[b]ased upon the abuse of the public trust by a high-ranking public official as well as the significant security risk that the United States was exposed to by Henry Barr's drug activity and his misrepresentations," that Barr be sentenced to a significant period of confinement. App. at 782–83. No request was made in the Government's Sentencing Memorandum for any departure from the guidelines.

In the first version of the Presentence Report, dated March 15, 1991, the Probation Officer noted the Government's request for the two level increase:

> The Government's sentencing memorandum reflects that the defendant abused a position of public trust in a manner which significantly facilitated the commission or concealment of the false state-

ment offenses. The Government contends that Mr. Barr was brought in under special exemption and his high position of public trust caused the security office of the Department of Justice to give great deference to his representations where most applicants are thoroughly investigated prior to granting them any access to nation [sic] security information.

> The probation officer does not believe that the enhancement for abuse of a position of public trust is applicable in this case. There is no indication that the defendant used his position as Assistant to the Attorney General to facilitate his making false statements to the Government. While his position at the Department of Justice may have contributed to that department giving him deference with regard to representations made on an application and during an interview, it does not appear that Mr. Barr took any affirmative or overt action to conceal his false statements or to hinder his background investigation.

App. at 735.[5] As we note above, the Probation Officer also included, in his calculation of the Offense Level in this original version of the Presentence Report, a two level reduction reflecting what he found to be Barr's acceptance of responsibility.

At the conclusion of the Presentence Report, Paragraph 68, Factors That May Warrant Departure, the Probation Officer commented that the Court could increase the sentence above the guideline range "if the defendant committed the offense in order to facilitate or conceal the commission of another offense." He commented that Barr's false statements concealed his past possession of cocaine but noted that the increase in offense level resulting from the application of the multiple counts provisions may have adequately addressed this matter. The Probation Officer concluded

---

4. Although the Government does not cite § 3B1.3 of the Guidelines in making this request for a two level increase, we presume the request was made pursuant to this section since the Government tracks its language in the paragraph quoted above.

5. These two paragraphs appear again in the Addendum to the second revision of the Presentence Report as the Probation Officer's response to the Government's Objection to the failure to give a two level increase for "Role in the Offense." App. at 866.

by stating that he had "identified no other factors warranting a departure." App. at 742–43.

On April 5, 1991, the U.S. Attorney sent a letter to the Probation Officer, commenting on the Presentence Report. He objected to the award of a two level reduction in the offense level for acceptance of responsibility. He then turned to Barr's violation of public trust:

Second, beyond Mr. Barr's failure to give any meaningful acknowledgement of guilt, of the consequences of his conduct and of its effect upon law enforcement efforts in this country, the Pre-Sentence Report does not, in the Government's view, accord sufficient recognition of the importance of the high position of public trust violated by Henry Barr. In fact, the Report makes no distinction between Mr. Barr and a gas station attendant, for example, in terms of his actions or his responsibility. Mr. Barr was an Assistant to the chief law enforcement office [sic] of the United States and handled criminal and intelligence matters. The seriousness of Mr. Barr's conduct in light of the access he had to highly sensitive law enforcement information and to national security information needs to be addressed and underscored both by your office and by the Court.

App. at 786. The U.S. Attorney also commented in this letter on the advisability of an upward adjustment of two levels for obstruction of justice, relating to the 1986 investigation of Richard Guida.

The Probation Officer issued a revised Presentence Report on April 8, 1991. He amended his previous calculations of the offense level to delete the two level reduction for acceptance of responsibility because the materials and post-trial statements submitted by the defendant did "not completely meet guideline criteria." App. at 793. Paragraph 68, Factors That May Warrant Departure, was identical to the Paragraph 68 included in the March 15 version of the report. App. at 800.[6]

The defendant responded to this revised report by objecting to the failure to award the two level reduction for acceptance of responsibility.

On April 18, 1991, a second revised Presentence Report was issued by the Probation Office. Again, a two level reduction for defendant's acceptance of responsibility was not granted. In this second revised report, the Probation Officer calculated a Total Offense Level of 8, calling for two to eight months imprisonment. Paragraph 68, Factors That May Warrant Departure, remained the same. App. at 865.

In the Addendum to the April 18 report, the Probation Officer noted that the Government had identified four objections in its Sentencing Memorandum and letter. One of these had been resolved by disallowing the reduction for acceptance of responsibility. The other three objections were described as referring to 1) Paragraph 19 of the report, Adjustment for Role in the Offense; 2) Paragraph 13, Adjustment for Obstruction of Justice; and 3) Paragraph 68, Factors That May Warrant Departure. Concerning the objection to Role in the Offense, the Probation Officer repeated the two paragraphs from his March 15 Report on abuse of a position of public trust, including his conclusion that enhancement for abuse of such a position was not "applicable in this case." App. at 866.

In his comments in regard to the third Government objection, the Probation Officer stated:

In its letter, the Government also contends that the presentence report fails to accord sufficient recognition to the unique combination of offense and Governmental position in the defendant's case, and indicates that these aggravating circumstances need to be addressed by both the probation office and the Court. *There is the inference that the circumstances may warrant an upward departure.*

In response, the probation officer notes that the grounds for departure listed in

---

6. The April 8 revision does not include the customary Presentence Report Addendum of the Probation Officer, discussing and/or resolving the objections of the parties to that report.

Section 5K2.1 through 5K2.15 of the Guidelines generally involve actual conduct or tangible consequences as justification for an upward departure. Although there may have been the potential for abuse, there is no evidence that Mr. Barr compromised his position while in Government service. As noted by the Government, a defendant's employment background is not ordinarily relevant to guideline calculations. The matter raised by the Government may be better addressed, if at all, through imposition of a sentence within the applicable guideline range rather than through an upward departure.

App. at 867 (emphasis added).

The Probation Officer concluded the section addressing the Government's objections by commenting that these objections would need to be resolved by the Court.

At the sentencing hearing, the district court denied both the Government's requests to increase and the defense's request to decrease the Probation Officer's calculated Total Offense Level of 8. In doing so, the judge commented that

the Probation Officer resolved all of the objections correctly, and for the reasons that have been communicated to the parties in the pre-sentence report. And we accept the reasons of the Probation Officer in their resolution and will affirm the resolution in each instance by the Probation Officer.

App. at 705.[7] After resolving the objections, the trial judge determined that he would depart upward from the guidelines in imposing sentence. He found that

aggravating circumstance exist [sic] that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. The calculated guideline range gives no considera-

tion to the fact that Henry Barr held a high ranking position with the Department of Justice and that criminal activity by public officials tends to erode public confidence in government. As an Assistant to the Attorney General, Henry Barr served as a liaison to various law enforcement agencies. He was responsible for reviewing sensitive and classified information related to criminal and intelligence matters. For these reasons, the Court is departing upward four levels to a guideline range of 10 to 16 months.

App. at 724.[8]

Barr's first argument in support of his appeal of the sentence is that the issues relating to his employment and to conduct affecting the public trust already have been taken into consideration by the sentencing guidelines and, therefore, the reasons articulated by the district court are insufficient to justify the departure under § 3553(b). Specifically, he points to guideline § 3B1.3 which provides: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels." Barr argues that this section reflects the Commission's judgment that it is not the "position" that should be considered in imposing judgment of sentence, but whether or not the position is used to facilitate the commission of an offense.

It may be correct that § 3B1.3 itself speaks directly only to those abuses of public trust that facilitate the commission or concealment of an offense. We do not agree, however, with Barr's contention that the language of this section reflects the Commission's considered judgment that a combination of high-ranking position and criminal activity other than that which spe-

---

7. The judge later also stated that he "denied the requests of the government to increase this range for the reasons offered and previously addressed by me. And we've denied a defense request to reduce for the acceptance of responsibility." App. at 723–24.

8. Sentencing Guideline § 5K2.0 states:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

cifically falls under § 3B1.3 can never be deemed the type of aggravating circumstance that justifies departure under § 3553(b). Our review of the guidelines, policy statements, and the relevant commentary leads us to the opposite conclusion. In fact, the guideline's general application principles for departure state that, with the exception of several factors not applicable to Barr's case, "the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." Sentencing Guidelines Chapter One, Part 4, *Departures.* Thus we reject Barr's contention that the district court's departure was erroneous because the circumstances relied upon for the departure had been taken into consideration by guideline § 3B1.3.

Barr also asserts that the district court erred in finding that in his position as Assistant to the Attorney General he "was involved in preventing criminal activity by public officials." In particular, Barr points to the Attorney General's testimony that Barr had no substantive law enforcement responsibilities. *See* App. at 370.

■■■■■ Barr is correct in asserting that the circumstances relied upon by the district court in departing from the guidelines must in fact exist. We are required, however, to "accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e). *See also Kikumura,* 918 F.2d at 1098. The district court made the following findings in conjunction with sentencing Barr:

As an Assistant to the Attorney General, Henry Barr served as a liaison to various law enforcement agencies. He was responsible for reviewing sensitive and classified information related to criminal and intelligence matters. He was involved in preventing criminal activity by public officials.

App. at 724.

Our review of the record reveals that then-Attorney General Thornburgh testified that Barr served as "a liaison between the Attorney General's office and various law enforcement and intelligence agencies with whom we dealt.... He would process information that came to my office, review the paper work, and carry out any assignments that I had that related to pending matters within the criminal and intelligence community." App. at 369–70. Testimony concerning Barr's duties at the Justice Department was also presented by Mary Lawton, the Justice Department Counsel for Intelligence Policy. Ms. Lawton explained that Barr was responsible for reviewing, before passing on to the Attorney General, each application made under the Foreign Intelligence Surveillance Act for permission to wiretap for intelligence, counter-intelligence, and counter-terrorism purposes. These applications were classified either secret or top secret. App. at 237. Ms. Lawton further testified that Barr was responsible for reviewing requests by intelligence agencies to engage in undercover activities for counter-intelligence and counter-terrorism purposes. App. at 240. Based on this testimony, we conclude that the district court's findings of fact can not be deemed clearly erroneous. We, therefore, reject Barr's argument that the aggravating circumstance upon which the district judge based his departure from the guidelines did not exist on the facts of this case.

■■■ As his next challenge to the upward departure, Barr alleges that the district court erred in failing to give notice of its intention to depart from the sentencing guidelines. If indeed the court did fail to give notice, we must vacate the sentence and remand for resentencing. The Supreme Court has recently held in *Burns v. United States,* —— U.S. ——, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), that Federal Rule of Criminal Procedure 32 requires a district court to provide reasonable notice that it is contemplating departure from the sentencing guidelines "on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government." Such notice must "specifically identify the ground on which the district

court is contemplating an upward departure." *Burns*, 111 S.Ct. at 2187.

To resolve this question, we must look to the record developed prior to and during the sentencing hearing. We have described above the various communications between the attorneys and the Probation Officer. As a result of our review of these documents, we find that Barr's claim regarding notice has merit. The Government nowhere directly requests a departure. The only reference to a likelihood of departure is the Probation Officer's finding of an "inference" in the Government's April 5, 1991, letter that "the circumstances" of the unique combination of offense and Governmental position in Barr's case may warrant an upward departure. App. at 867. This "inference" is not endorsed by the Probation Officer; he is of the opinion that the matter "may be better addressed, if addressed at all, through imposition of a sentence within the applicable guideline range rather than through an upward departure." *Id.* Thus, the Probation Officer, finding just an "inference" of such a contention by the Government, does not deem a departure appropriate or give the defendant sufficient notice that a departure is sought.

Moreover, even if one might have considered the "inference" to be a request by the Government for departure, the trial court at the sentencing hearing resolved the Government's objections by adopting the determinations of the Probation Officer, including perforce the recommendation that "abuse of position" would be better addressed through imposition of a sentence within the applicable guideline range. One must assume from the language of the court that it was considering all objections, including the Probation Officer's response to the inferred Government objections to Paragraph 68, Factors that May Warrant Departure. As the court stated,

> In this case I spent some time, after reviewing the report, in conferring with the Probation Department and doing some independent research. We're wrong sometime and we're right sometime. But, after our research, and an examination of these objections, as well as the arguments that were made here today, I'm perfectly satisfied that the Probation Officer resolved all of the objections correctly, and for the reasons that have communicated to the parties in the pre-sentence report. And we accept the reasons of the Probation Officer in their resolution and will affirm the resolution in each instance by the Probation Officer.

App. at 705.

When the court then announced the upward departure due to aggravating circumstances not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, i.e., that "Henry Barr held a high ranking position with the Department of Justice and that criminal activity by public officials tends to erode public confidence in government," App. at 724, the court, as a consequence of its prior resolution of the objections to the Presentence Report, already had eliminated the Government's "inferred" grounds for departure. It is not clear to us how the grounds cited by the court for departure in fact differ from the Government's "inferred" grounds. However, it is exactly because this is not clear that the defendant could not have had adequate notice either that the court was contemplating departure or, if so, of the grounds for that departure. In effect the court decided the factual and legal predicates for departure without notifying the parties. Such a procedure is now forbidden by *Burns*. Consequently, we will vacate Barr's sentence and remand to the district court for resentencing, with instructions both to provide Barr with the requisite notice of any ground on which the court contemplates an upward departure, and to determine the degree of departure from the guidelines in the manner that it finds appropriate for this case.[9] *See Kikumura*, 918 F.2d at 1113.

9. Because we find that Barr did not receive adequate notice of the upward departure and are remanding for resentencing on that ground, we will not go on to consider the question of the reasonableness of the departure.

## IV. ACCEPTANCE OF RESPONSIBILITY.

 Finally, we reject Barr's contention that the district court erred in denying him a reduction in sentence for acceptance of responsibility. Section 3E1.1(a) of the sentencing guidelines authorizes a reduction of two levels in the sentence of a defendant who "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct."

The district court adopted the rationale of the Probation Officer,[10] who suggested that the court deny such a reduction in Barr's sentence for acceptance of responsibility. In making this suggestion, the Probation Officer explained that Barr submitted materials to him indicating that Barr was engaged in unsuccessful plea negotiations with the Government up to the time of trial. During these negotiations Barr expressed willingness to plead guilty to either drug possession or false statement charges. Because no agreement was reached, Barr proceeded to trial "not necessarily to deny his offense conduct" but to preserve certain issues for appeal. App. at 856. In the Addendum to the presentence report, the Probation Officer further explained that, after Barr was found guilty, the Probation Officer interviewed him, and requested that he "submit a written statement that would in part provide information relative to the guideline adjustment for acceptance of responsibility. A statement was promptly received, but [the Probation Officer] felt the statement fell short as a direct acknowledgement of essential simple misconduct."[11] App. at 868. Barr later responded affirmatively when questioned by the Probation Officer regarding whether he had committed the offense conduct described in the indictment. *Id.*

On appeal, Barr reiterates the argument that he chose to go to trial only to preserve the issue of the applicability of the "exculpatory no" doctrine to the facts of his case for appeal, not to contest factual guilt.

 Because the sentencing judge "is in a unique position to evaluate a defendant's acceptance of responsibility," we give great deference on review to a sentencing judge's decision not to apply the two-level reduction for acceptance of responsibility to a particular defendant. *See* Guidelines § 3E1.1 application note 5; *United States v. Riviere*, 924 F.2d 1289 (3d Cir.1991) (appellate review of a district court's determination of this question is under the clearly erroneous standard); *United States v. Singh*, 923 F.2d 1039, 1042–43 (3d Cir.1991) (a sentencing judge's evaluation of a defendant's acceptance of responsibility should not be disturbed unless it is without foundation).

In light of the entire record, including the parties' conflicting accounts of the course of the pre-trial negotiations, and the Probation Officer's finding that Barr's written statement "fell short as a direct acknowledgement of essential simple misconduct," we cannot say that the court's determination that Barr had not accepted responsibility for his criminal conduct, and therefore was not entitled to a two-level reduction in his sentence, was clearly erroneous.

## V. CONCLUSION

Accordingly, while the judgment itself will be affirmed, the judgment of sentence will be vacated and the case remanded for further proceedings with respect to sentencing consistent with this opinion.

---

**10.** As stated above, the court explained that "after our research, and an examination of these objections, as well as the arguments that were made here today, I'm perfectly satisfied that the Probation Officer resolved all of the objections correctly, and for the reasons that have been communicated to the parties in the presentence report." App. at 705.

**11.** The court noted at the sentencing hearing that Barr apparently "hedged considerably for the officer to [have] write[n] that in this report." App. at 697. The court also noted that Barr should have known from experience that the "post trial phase of a case, and when he's being interviewed by the Probation Officer [is] a time for frankness, and that's all the officer was trying to elicit from him." App. at 696.