

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-15-2000

# United States v. Queensborough

Precedential or Non-Precedential:

Docket 99-3636

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Queensborough" (2000). *2000 Decisions*. Paper 198.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/198

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 15, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-3636

UNITED STATES OF AMERICA

v.

KEENE COURTNEY QUEENSBOROUGH,

     Appellant

On Appeal from the District Court of the Virgin Islands
Division of St. Thomas/St. John
(D.C. Crim. No. 96-cr-00090-1
District Judge: Hon. Thomas K. Moore

Argued April 10, 2000

Before: SLOVITER, ROTH and STAPLETON, Circuit  Judges

(Filed September 15, 2000)

     Thurston T. McKelvin
     Federal Public Defender
     Pamela Lynn Wood (ARGUED)
     Assistant Federal Public Defender
     St. Thomas, U.S. Virgin Islands
     00804-1327

     Attorneys for Appellant

James A. Hurd, Jr.
 United States Attorney
Kim L. Chisholm (ARGUED)
 Assistant United States Attorney
Charlotte Amalie, U.S. Virgin Islands
 00802-6424

Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Keene Courtney Queensborough, who pled guilty pursuant to a plea agreement to two counts of a seven count indictment, appeals from the judgment of sentence. He raises four issues, but in essence all challenge the District Court's grant of an upward departure under the federal sentencing guidelines.

I.

FACTS AND PROCEDURAL HISTORY

On February 15, 1996, Queensborough and Boman Rabsatt, a juvenile, accosted a man and a woman who were staying at the Cinnamon Bay Campground, which is part of the United States National Park in St. John, Virgin Islands. They first robbed the campers; then they forced them to an isolated section of the beach area. Rabsatt took the male victim further down the beach, forced him to lie face down, and put something that felt like a gun to the back of his head. Queensborough took the female victim over to some rocks and ordered her to take off her pants. When she began to pray aloud, he threatened to kill her. After demanding that she turn around and face the rocks, Queensborough held a gun to the woman's head and raped her. During the rape he told her, "[i]f you make a sound, I'll blow your fucking head off." Queensborough also forced the woman to perform oral sex, and raped her again.

2

Queensborough then said that his friend "had to have some of what he just had." He took the woman to the place where her male companion was being held and switched places with Rabsatt, who also raped the woman repeatedly at gunpoint and forced her to perform oral sex. Queensborough and Rabsatt then brought the man and the woman back together and began to talk about killing them. One of the perpetrators said that they had a boat and that "two other guys were waiting for them." One perpetrator also said that they might bring the woman with them and asked her if she could swim a half mile. Queensborough and Rabsatt then ordered the man and the woman to have sex with each other while the two perpetrators watched. Throughout the ordeal, they threatened the two victims with death at the point of a gun.

Both rapists were apprehended and charged. Queensborough was indicted in the District Court of the Virgin Islands, Division of St. Thomas/St. John, on seven counts as follows: Count One for aggravated rape; Count Two for kidnapping with intent to commit rape; Count Three for kidnapping; Counts Four and Five for robbery; Count Six for possession of a deadly weapon during commission of a crime of violence; and Count Seven for carrying a firearm during and in relation to a crime of violence. Counts One through Six charged violations of territorial law, five of which were assimilated into federal law pursuant to the Assimilative Crimes Act (ACA), 18 U.S.C. S 13(a).1 Count Seven charged a violation of a federal criminal statute.

_____

1. The ACA provides that:

> Whoever within or upon any [federal enclave] is guilty of any act or
> omission which, although not made punishable by any enactment of
> Congress, would be punishable if committed or omitted within the
> jurisdiction of the State [or] Territory . . in which such place is
> situated, . . . . shall be guilty of a like offense and subject to a like
> punishment.

18 U.S.C. S 13(a).

We have explained:

> Under the ACA, if conduct prohibited by state [or territorial] law
> occurs on federal land, the state criminal law is assimilated into

3

There was a delay in proceeding with the charges against Queensborough during the period he was declared not competent to stand trial. After he was declared to have regained his competency, Queensborough reached a plea agreement with the government pursuant to which he pled guilty to Count One, which charged the assimilated crime of aggravated rape, in violation of Title 14 V.I.C.,SS 1701(2) and 1700(c) and 18 U.S.C. SS 13 and 2, and Count Seven, carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. S 924(c)(1) and 2.

The plea agreement between Queensborough and the government provides that "[t]he United States Attorney reserves its right to allocute at the time of sentencing . . . . The government further agrees to recommend a sentence within the applicable Guidelines range." App. at 103. It also contains the following:

> The parties agree that the Court shall be free to impose whatever sentence is deemed appropriate, and that the Court shall not be bound by the parties' recommendations at the time of sentencing.

> The parties agree that the final determination of the applicable sentence under the Guidelines, including any and all adjustments and determination of the defendant's criminal history category, shall be left to the Court after its review of the Presentence Report. However, the parties shall be free to object to any Guideline calculations and other information contained in the Presentence Report, and to appeal from the sentence imposed . . . .

App. at 105.

The total offense level for the aggravated rape was 32 and the guideline range for that count was 121–151 months

_____

> federal law so long as that conduct is not already made punishable by any `enactment of Congress.' In other words, the ACA fills gaps in the law applicable to federal enclaves, ensures uniformity between
> criminal prohibitions applicable within the federal enclave and within the surrounding state, and provides residents of federal enclaves with the same protection as those outside its boundaries.

United States v. Hall, 979 F.2d 320, 322 (3d Cir. 1992) (citation omitted).

4

imprisonment.2 After hearing from the parties on the sentencing issue, the court sentenced Queensborough on the aggravated rape count to a term of twenty years imprisonment, which represented a substantial upward departure. On the firearm count, the court sentenced Queensborough to a term of 60 months imprisonment, to be served consecutively, a term set by statute pursuant to U.S.S.G. S 2K2.4 and 18 U.S.C. S 924(c). Queensborough's attorney objected to the District Court's sentence as an abuse of discretion. App. at 97. After the sentencing hearing was completed, Queensborough's attorney raised "an additional objection to the legality of the sentence," stating that although she and Queensborough had been given notice by the Probation Office of "a possibility of upward departure," they had not been given notice"that there was actually going to be an upward departure." App. at 101.

Queensborough filed a timely appeal. The District Court had jurisdiction over this case pursuant to 18 U.S.C. S 3231 and this court has jurisdiction over the appeal under 28 U.S.C. S 1291.

II.

DISCUSSION

A.

Notice of Intent to Upwardly Depart

Queensborough first argues that the District Court failed to give him reasonable notice of its intent to upwardly depart from the sentencing guidelines and failed to identify with specificity the grounds for said departure.

_____

2. The Sentencing Guidelines apply to convictions under the ACA and direct the sentencing court to "apply the most analogous offense guideline." U.S.S.G. S 2X5.1. Here, the court applied the guideline in U.S.S.G. S 2A3.1 for criminal sexual abuse as most analogous to the crime of aggravated rape.

Although Rule 32 of the Federal Rules of Criminal Procedure does not contain any language requiring that the District Court give the defendant notice of a possible upward departure, the Supreme Court has held that,

> before a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, . . . the district court[is required to] give the parties reasonable notice that it is contemplating such a ruling. This notice must specifically identify the ground on which the district court is contemplating an upward departure.

Burns v. United States, 501 U.S. 129, 138-39 (1991) (emphasis added); see also United States v. Barr , 963 F.2d 641, 655-56 (3d Cir. 1992).

The government argues that Queensborough was given advance notice that satisfied Burns because the ground for departure on which the court relied was "identified as . . . ground[s] for upward departure . . . in the presentence report." 501 U.S. at 138. The government refers to the following language in the PSR, which appears under the heading "Factors That May Warrant Departure":

> 91. Presentation of information in this section does not necessarily constitute a recommendation by the probation officer for a departure.

> 92. According to U.S.S.G. S 2A3.1, Application Note 5, "If a victim was sexually abused by more than one participant, an upward departure may be warranted, See S 5K2.8 (Extreme Conduct)."

Like the government, the District Court regarded the PSR as having provided the requisite notice. In sentencing Queensborough, the court stated:

> As is recited in the Presentence Report, and so that counsel had notice, Paragraph 92, according to the basic Sentencing Guideline that applies here for criminal sexual abuse, an upward departure is warranted if the victim was sexually abused by more than one participant, and as well under Section 5(k)(2.8) [sic], which deals with extreme conduct.

6

And as it says, if the defendant's conduct is unusually heinous, cruel, brutal or degrading -- well, for a rape, I don't know that it qualifies as unusually heinous, cruel or brutal; however, to then order the two victims to have sex themselves, in your presence, at the point of a gun, is unusually degrading. So I'm not going to prolong it any longer.

App. at 95 (emphasis added).

The District Court thus read the PSR to give notice (1) that an upward departure was warranted (2) based on the sexual abuse by two perpetrators and other extreme conduct in connection with the sexual abuse. We agree with the District Court's conclusion that the PSR gave the required notice that a departure could be warranted and that it could be on the basis of extreme conduct, a conclusion supported by the PSR's reference to S 5K2.8 and extreme conduct in its quotation of the application note.

Queensborough relies on two opinions in support of his contention that he was not given the required notice: the Supreme Court's opinion in Burns and this court's decision in Barr. In Burns, a former supervisor in the United States Agency for International Development (AID) who had authorized payment of AID funds into an account that he controlled pled guilty to a three-count information charging him with theft of Government funds, making false claims against the government, and attempted tax evasion. The plea agreement expressed the parties' expectation that the petitioner would be sentenced within the guidelines range corresponding to an offense level of 19 and a criminal history category of I. The PSR confirmed this expectation and expressly concluded that "[t]here are no factors that would warrant departure from the guideline sentence." Burns, 501 U.S. at 131. Nonetheless, the district court departed upward from the guideline sentencing range without any prior notice to the defendant. The district court based its departure on (1) the extensive duration of petitioner's criminal conduct; (2) the disruption to governmental functions caused by petitioner's conduct; and (3) petitioner's use of his tax evasion offense to conceal his theft and false claims offenses.

7

It was in this "extraordinary case," id. at 135, where the defendant was given no inkling in either the PSR or in a prehearing submission by the government that there might be grounds for an upward departure, that the Supreme Court held that Fed. R. Crim. P. 32 required the district court to provide "reasonable notice that it [was] contemplating" an upward departure and to specifically identify the ground for the contemplated departure. The Court expressly noted that "[i]n the ordinary case, the presentence report or the Government's own recommendation will notify the defendant that an upward departure will be at issue and of the facts that allegedly support such a departure." Id. Unlike the"extraordinary" situation in Burns, here the PSR did identify "a ground for upward departure." Inasmuch as the PSR satisfied the basic requirement of Burns ("before a district court can depart upward on a ground not identified as a ground for upward departure . . . in the presentence report"), Queensborough was not entitled to additional notice from the court.

Barr is similarly distinguishable. In that case, the district court decided to depart upward by four levels based on the fact that the defendant, a former assistant to the Attorney General, "held a high ranking position with the Department of Justice and that criminal activity by public officials tends to erode public confidence in government." Barr, 963 F.2d at 654. Unlike the PSR in Burns, the PSR in Barr did identify a possible ground for departure in the section captioned "Factors That May Warrant Departure," but it identified only one possible ground, i.e., the commission of " `the offense in order to facilitate or conceal the commission of another offense.' " Id. at 652. The PSR explicitly stated that the probation officer had" `identified no other factors warranting a departure.' " Id. at 653.

On appeal, we held that the case was governed by Burns, and reversed. We held that inasmuch as the PSR had not identified the ground relied on by the district court as a possible ground for upward departure, the defendant should have received notice of the district court's intent to depart based on his high ranking government position. We noted that the government never directly requested a

8

departure and that the only reference to a "likelihood of departure" based on the defendant's high ranking position was the probation officer's statement, in an addendum to a revised version of the PSR, that a letter submitted by the government could be read to contain an "inference" that a departure might be warranted by the "unique combination of offense and Governmental position in Barr's case." Id. at 656. We held that "finding just an `inference'. . . does not deem a departure appropriate or give the defendant sufficient notice that a departure is sought." Id.

Here, by contrast, there was more than "just an inference" that a departure might be appropriate. As we have already explained, the District Court permissibly interpreted paragraph 92 of the PSR as identifying sexual abuse by two perpetrators and other extreme conduct in connection with the sexual abuse as possible grounds for departure. A reasonable reader would understand both from the placement and language of paragraph 92 in Queensborough's PSR that, in light of the circumstances, an upward departure based on extreme conduct was both possible and warranted. We disagree with Queensborough that paragraph 92 was ineffective to give him notice simply because paragraph 91 of the PSR stated that "information in this section does not necessarily constitute a recommendation . . . for a departure" (emphasis added). The possible grounds were identified in the PSR, and we do not read either Burns or Barr as requiring any more.

Queensborough makes the additional argument that he lacked notice of the factual basis for the departure. We disagree. Not only does the PSR review in excruciating detail the circumstances of the sexual assaults on the female victim but the PSR, under the heading Part E. FACTORS THAT MAY WARRANT DEPARTURE, which appears in large type and bold face, also quotes the application note to U.S.S.G. S 2A3.1 which states that an upward departure may be warranted when one of the victims was sexually abused by more than one participant. The application note, quoted verbatim in the PSR, then includes a citation to U.S.S.G. S 5K2.8, and in parenthesis "(Extreme Conduct)." That guideline, S 5K2.8, provides:

9

> If the defendant's conduct was unusually heinous,
> cruel, brutal, or degrading to the victim, the court may
> increase the sentence above the guideline range to
> reflect the nature of the conduct. Examples of extreme
> conduct include torture of a victim, gratuitous
> infliction of injury, or prolonging of pain or humiliation.

U.S.S.G. S 5K2.8.

That Queensborough's conduct was "unusually heinous,
cruel, brutal, or degrading to the victim" is evident from the
numerous facts previously detailed in the PSR, which
include multiple rapes, forced oral sex, two victims,
repeated death threats, and multiple attackers. The District
Court focused on the "unusually degrading" order to the
two victims to have sex in the presence of the perpetrators
when it stated that it was departing upward based on the
extreme conduct. App. at 95, 113. That there could be an
upward departure on this basis could have come as no
surprise to Queensborough; this aspect of his conduct
featured prominently in the PSR's discussion of his offense.3

In light of the explicit description of the sordid facts, we
believe Queensborough did not lack notice of the factual
basis for the departure. In fact, at sentencing
Queensborough's counsel did not object on the basis that
she lacked notice that these facts might support a
departure; indeed, she acknowledged having notice that
"there was a possibility of upward departure." App. at 101.
Her objection was simply to the lack of notice that "there
was actually going to be an upward departure." App. at

_____

3. The PSR summarized the female victim's statement:

> [T]he two rapists told [the victims] that they . . . would now have
sex
>
> together and that she would be on top. One of them pushed [the
> woman] down on top of [the man], who was now lying face-up in the
> sand. The rapists told [the woman] to take off her clothes --
> everything except her socks. [The man] was told to take off his
> pants. [The victims] pretended to have sex but one of the rapists
put
> his hand between their genital area and stated that [the man's]
> penis was not hard. The rapist said that if [he] did not get hard
> within thirty seconds, they would kill him. [The woman] pleaded
> with the rapists to give [him] time, that he was frightened.

10

101. But Burns contains no such requirement and Queensborough cites to no authority that does.

We conclude therefore that under the circumstances here, Queensborough was given the notice required by Burns.

B.

Breach of the Plea Agreement

Queensborough next asserts that the government violated its plea agreement to recommend a sentence within the applicable guidelines range. Queensborough concedes that he did not raise this objection in the District Court. However, we have stated that whether the government violated the terms of a plea agreement is a question of law subject to plenary review that may be raised on direct appeal despite the defendant's failure to raise the issue at sentencing. See United States v. Moscahlaidis , 868 F.2d 1357, 1360 (3d Cir. 1989). But see, e.g., United States v. Conner, 930 F.2d 1073, 1076-77 (4th Cir. 1991) (reviewing district court's resolution of whether government breached plea agreement under clearly erroneous standard); United States v. Ataya, 864 F.2d 1324, 1337 (7th Cir. 1988) (same).

We have made clear that the government has an obligation to " `adhere strictly to the terms of the bargain it strikes with defendants.' " Moscahlaidis , 868 F.2d at 1361 (quoting United States v. Miller, 565 F.2d 1273, 1274 (3d Cir. 1977)). "Because the defendant, by entering into the plea, surrenders a number of her constitutional rights, `courts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed.' " United States v. Nolan-Cooper, 155 F.3d 221, 236 (3d Cir. 1998) (quoting United States v. Hayes, 946 F.2d 230, 233 (3d Cir. 1991)). In determining whether the government has violated the terms of the plea agreement, we ask "whether the government's conduct is consistent with the parties' reasonable understanding of the agreement." United States v. Roman, 121 F.3d 136, 142 (3d Cir. 1997) (quotation omitted).

11

The government does not disagree with Queensborough's understanding that it was to recommend a sentence within the applicable guidelines, and it maintains that it did. Indeed, in her allocution at the sentencing hearing the prosecutor stated that "the government believes that a sentence of 151 months for the act of aggravated rape is an appropriate sentence, covering the conduct of this defendant . . . ." App. at 79-80. As the guideline range for that crime was 121-151 months, the government's recommendation is consistent with its plea agreement.

Queensborough argues that the government paid only "lip service" to its agreement and that it implicitly suggested to the court that an upward departure was warranted. Queensborough's argument that the government failed to honor its agreement is based on the following colloquy:

> [THE GOVERNMENT] But the Court has to acknowledge that these crimes are very serious and very savage. This defendant raped -- this is a situation not so much unlike the case of the sentencing Attorney Wood[for Queensborough] mentioned, where a defendant committed --
>
> [THE COURT] It is like or not like?
>
> [THE GOVERNMENT] It's not unlike that case, because this is a situation where we have three separate acts of sexual abuse occurring by this defendant that night. [outlining each assault] . . . . So, this is a situation where probably, you know, different acts of sexual aggravated rape could have been charged, but only one was charged to cover this conduct.
>
> So I think that this is a very savage and very serious crime. And even though the government in the plea agreement has agreed to recommend the sentence within the guideline range, the plea agreement does acknowledge that a departure is warranted when there's more than one victim.4

---

4. This appears to have been a misstatement. The prosecutor apparently intended to refer to the presentence report, which would have been an accurate reference. Queensborough now argues the slip of the tongue supports his claim but made no attempt to correct the matter at the sentencing level, where it was more likely to have been useful.

12

I think here we have a situation where you have
[female victim] being savagely abused by this
defendant, and then you have [male victim] as well
being abused by this defendant.

So, this is a situation, I think, that calls for a sentence
at the higher end of the guideline range, and the
government believes that a sentence of 151 months for
the act of aggravated rape is an appropriate sentence,
covering the conduct of this defendant against both
[victims].
[discussion of another case that the court had
questioned him about]

So the fact that there were two victims here is an
aggravating factor the Court should take into account. If
not, the government is recommending the high end of
the guideline range, but it is factor that would warrant
that sentence. . . .

App. 78–80 (emphases added).

The plea agreement provided that each side retained the
right to allocute at sentencing. This is the essence of the
government's allocution on this issue before the District
Court at sentencing. The government, having recommended
a sentence at the high end of the guideline range, offered
reasons in support of that recommendation. It happened
that those reasons, as the government noted, also
warranted an upward departure, but the government
explicitly stated that it was recommending a sentence
within the applicable guideline range. This was consistent
with the agreement. Nothing in the plea agreement suggests
or states that the government may not make the statements
it did.

Queensborough emphasizes the decision of the First
Circuit in United States v. Canada, 960 F.2d 263 (1st Cir.
1992), where the court stated that the government is
prohibited not only from an "explicit repudiation of the
government's assurances, but [the agreement] must in the
interests of fairness be read to forbid end-runs around
them." Id. at 269 (citation and quotations omitted). We
agree with the principle, but we do not agree with
Queensborough that the prosecutor made an "end run"

13

around the agreement in this case. Although the prosecutor made a misstatement, see note 4 supra , the District Court was aware of both the plea agreement and the PSR, and there is no likelihood that it was influenced as a result.

Nor do we think that the prosecutor's remarks concerning the savageness of Queensborough's conduct constituted a breach of the plea agreement. The prosecutor's statement, quoted above supra, was made in response to defense counsel's argument that Queensborough should be sentenced to 121 months, the low end of the guideline range. In support of this argument, defense counsel referred, inter alia, to the sentence given a defendant named Caswell Fredericks in another rape case. Fredericks had pled guilty to four aggravated rapes, and Queensborough's counsel, in attempting to analogize to the Fredericks situation, emphasized that Fredericks had"also received the ten year minimum mandatory, and thefive years on the gun . . . . And that was on four separate occasions, each of which being an aggravated rape." App. at 69. We think it clear that, in this case, the prosecutor's emphasis on the severity of Queensborough's crime and on the fact that multiple rapes could have been charged for his conduct was in response to the Fredericks allusion and was intended to support the government's recommendation of 151 months, the high end of the guideline range, rather than the 120 months to which Fredericks was sentenced.

Queensborough hones in on the following two sentences of the government's allocution:

> So the fact that there were two victims here is an aggravating factor the Court should take into account. If not, the government is recommending the high end of the guideline range, but it is factor that would warrant that sentence. . . .

App. at 80.

We do not agree with Queensborough's charge that by this statement the prosecutor "only suggested a sentence within the guidelines range . . . as an alternative if the court did not upward depart." Appellant's Br. at 21. When the entirety of the prosecutor's statements on Queensborough's sentence is read, it is manifest that she

14

initially referred the court to the government's promise to recommend a sentence within the guideline range, App. at 79, and then, on two occasions, explicitly stated that the government was recommending to the court a sentence within that range. App. at 79, 80. In that context, the reference to "an aggravating factor" can only be read as a basis for a sentence at the high end of the guideline range, as the prosecutor made clear by adding "is [a] factor that would warrant that sentence. . . ." App. at 80. Queensborough does not point to any statement by the prosecutor recommending that the court depart upward because there is no such statement.

The plea agreement recognized that the District Court was free to reject the government's recommendation. The court chose to do so, and, as is evident from the court's remarks, it did so on the basis of its abhorrence of the circumstances of the crime. Notably, the plea agreement did not provide that Queensborough was free to withdraw his plea if the court sentenced him to a longer prison term. Cf. United States v. Grant, 117 F.3d 788, 792 n.5 (5th Cir. 1997) (agreement provided that defendant could withdraw guilty plea if court set an offense level higher than that in the plea agreement). The prosecutor adhered to the terms of the agreement, and we see no basis to vacate the sentence on the ground of a breach of the plea agreement.

C.

Excessive Departure

In addition to his challenge to the process leading to the departure, Queensborough asserts two separate but related challenges to the fact of departure. First, he contends that the District Court's decision to upwardly depart from the guidelines based on extreme conduct is not supported by the record and that such a departure was not permissible under the guidelines. Second, he contends that the District Court abused its discretion by imposing an excessive upward departure. We review a district court's decision to depart from the applicable guideline range for abuse of discretion. See Koon v. United States, 518 U.S. 81, 99-100

15

(1996). "A district court by definition abuses its discretion when it makes an error of law." Id. at 100.

A district court must order a sentence within the relevant guideline range " `unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " United States v. Kikumura, 918 F.2d 1084, 1098 (3d Cir. 1990) (citing 18 U.S.C. S 3553(b)). In Koon, the Supreme Court noted that the sentencing guidelines provide "considerable guidance . . . by listing certain factors as either encouraged or discouraged bases for departure." 518 U.S. at 94. Encouraged factors are those "the Commission has not been able to take into account fully in formulating the guidelines." U.S.S.G. S 5K2.0. Because extreme conduct under U.S.S.G. S 5K2.8 is an encouraged factor, see, e.g., United States v. Lewis, 115 F.3d 1531, 1539 (11th Cir. 1997), the sentencing court may depart if the "applicable guideline does not already take it into account," United States v. Iannone, 184 F.3d 214, 226 (3d Cir. 1999). If, on the other hand, the applicable sentencing guideline does take the encouraged factor into account, the sentencing court may depart upward if the encouraged factor" `is present to a degree substantially in excess of that which ordinarily is involved in the offense.' " Koon, 518 U.S. at 95 (quoting U.S.S.G. S 5K2.0).

Queensborough's PSR calculated his offense level as 32 and his Criminal History as I, resulting in a guideline range of 121-151 months imprisonment. As noted above, the District Court, granting an upward departure, sentenced Queensborough to 240 months (20 years) imprisonment on the aggravated rape count and to the statutorily mandated sentence of 60 months on the firearm count, to run consecutively. It is the sentence for the aggravated rape that is the basis for the appeal.

1. Record Support for the Departure

Queensborough argues that the record does not support the finding of extreme conduct because both of the victims

16

stated that they only pretended to have sex with each other. That argument is a non sequitur. Being put in a position where the victim must pretend to have sex is degrading; "extreme" is defined by the guidelines to encompass degrading conduct. See U.S.S.G. S 5K2.8. Moreover, the court stated at sentencing that it was the order itself to have sex that was degrading.

Queensborough then asserts that the District Court erred by failing to make any comparison between the degradation in this case and a "typical" sexual assault case. In essence, Queensborough argues that the District Court should have established a factual basis involving a typical sexual assault case, thereby providing a baseline against which to compare Queensborough's conduct. The comparison to which Queensborough alludes appears to be that which may be required when departing based on extreme psychological injury under U.S.S.G. S 5K2.3, which applies "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense." Although rape is a particularly intrusive crime, probably more than any other, and the victim of a rape may suffer severe psychological damage for long periods, if not forever, the District Court did not depart on the basis of S 5K2.3 but under S 5K2.8. That section only requires that the court determine that the conduct involved "was unusually heinous, cruel, brutal, or degrading."

The District Judge, who had considerable experience presiding over criminal cases, did not err in characterizing the events as degrading and Queensborough's conduct as extreme. Given the repetitive number of instances of intrusive physical contact, the order that the two victims have sex, and the repeated death threats, the record amply supports a departure based on extreme conduct. See United States v. Johnson, 144 F.3d 1149, 1150-51 (8th Cir. 1998) (affirming departure under U.S.S.G. SS 5K2.8 and 5K2.3 based on defendant's conduct during rape and on severe psychological injury); Lewis, 115 F.3d at 1538-39 (affirming departure under U.S.S.G. S 5K2.8 based on number and nature of assaults).

17

2. Whether the Departure was Authorized

Queensborough also argues that no upward departure was legally permissible because his conduct was already taken into account by the guidelines. Queensborough does not suggest that the 20 year sentence imposed by the District Court was unauthorized by statute. Under the ACA, which applies here because the offense took place on federal land, i.e., a national park, Queensborough was subject to "a like punishment" to that applicable under the state or territorial law. 18 U.S.C. S 13(a). Courts have interpreted "like punishment" to mean that state law sets the minimum and maximum punishment while the federal sentencing guidelines should be used to determine the actual sentence within that range. See, e.g., United States v. Pierce, 75 F.3d 173, 176 (4th Cir. 1996); United States v. Marmolejo, 915 F.2d 981, 984 (5th Cir. 1990); United States v. Garcia, 893 F.2d 250, 254 (10th Cir. 1989).

In this case, Queensborough was charged with the assimilated crime of aggravated rape which carries a term of imprisonment of 10 years to life under Virgin Islands law. See 14 V.I.C. S 1700(c). Therefore, the District Court, although required to determine the actual sentence using the federal sentencing guidelines, was authorized to sentence within that range, i.e., up to life imprisonment.

The thrust of Queensborough's argument is that his offense level was increased by four levels for aggravated sexual assault by force or threat and an additional four levels for abduction, thereby resulting in an adjusted offense level of 35, which he claims took into account all of his conduct, including any degradation associated with criminal sexual abuse. We disagree. As an encouraged factor under the guidelines, extreme conduct may be the basis for an upward departure if the "applicable guideline does not already take it into account," Iannone, 184 F.3d at 226, or, if the guideline does take it into account, if the factor is present to a degree substantially in excess of that ordinarily involved in the offense. It is evident that the criminal sexual abuse guideline under which Queensborough was sentenced contemplates upward departures based on extreme conduct because the application notes state that such a departure may be

18

appropriate "[i]f a victim was sexually abused by more than one participant." U.S.S.G. S 2A3.1, Application Note 5. The guideline does not state, and Queensborough has not suggested, that abuse by more than one participant is the only basis for an extreme conduct departure. Here, given the patently degrading nature of the order that the two victims have sex, the District Court could properly have concluded that Queensborough's conduct was extreme to a degree not adequately taken into account by the guidelines. See Lewis, 115 F.3d at 1538-39.

3. The Extent of the Departure

Finally, Queensborough argues that even if an upward departure was permissible the District Court abused its discretion by ordering an excessive departure equivalent to an increase of five or six levels. He contends that even if he "had inflicted permanent or life-threatening bodily injury, the increase in his offense level would have been only four levels." Appellant's Br. at 28 (citing U.S.S.G.S 2A3.1(b)(4)). He relies on our statement that "analogy to the guidelines is also a useful and appropriate tool for determining what offense level a defendant's conduct most closely approximates." Kikumura, 918 F.2d at 1112. However, "[a]t this stage, the question is no longer whether the district court has substituted its judgment for that of the Sentencing Commission, but whether the court of appeals should substitute its judgment for that of the district court." Id. at 1110.

Our dissenting colleague, who agrees that an upward departure was appropriate, nonetheless would remand because he believes that the District Court gave"no clue as to why it decided that a five-level departure was warranted," dissenting op. at 33, and that "the reasonableness of the degree of departure in this case is not apparent from the record." Dissenting op. at 34. He would follow the process that we used in United States v. Jacobs, 167 F.3d 792 (3d Cir. 1999). Unlike our colleague, we believe that both the justification for an upward departure of the extent given and the District Court's reasons are fully set forth on the record.

19

The PSR, which was available to both the defense and the District Court, contains a Victim Impact Statement from each of the two victims. Lest there be any question about the extent of the psychological injury to the victims, a brief review of the written statement of the female victim, who said that she "knew bad things did happen, but did not know that evil like this existed," which was included in the PSR, fully sets forth the "devastating" effect on her of the brutality of the multiple rapes. She related that, inter alia, she had "cried every day for months;" "continuing nightmares;" "continuing months of counseling;" "loss of the ability to focus on meditation or prayer without becoming distracted by reliving the horror of that night;" "waiting in terror for [AIDS] and pregnancy testing;" "the horror, shame, and embarrassment, when news of this appeared in newspapers and on t.v. programs;""the difficulty of trying to handle the everyday events of life while dealing with this;" "much of what made my life happy and worth living was not available to me for many months. . . and in some ways may never return."

The written statement of the male victim included in the PSR was similar. He related that "[t]he hatred, brutality, and violence that we were subjected to . . . has permanently changed my life;" he became "incredibly fragile;" "experienced repeated and uncontrollable panic . . . directly related to the violent crimes;" because"during much of the violence, I was held down from behind, with a gun in the back of my head or in the side of my face. . . [in the months that followed] I frequently panicked, fearing that someone was about to attack me from behind, only to turn and find no one;" "could no longer walk alone [in the forest] without panic and extreme anxiety;""sought and received weekly counseling;" had not fully healed"more than one and one-half years after that violent night;" "I still find myself lying awake thinking about the horrors of that night."

Both victims commented in their written statements about the length of the sentence that the District Court had to set. The female victim wrote, "I know you can not return [my happy spirit] to me, but you can make certain that others don't lose theirs as well. It is my belief, backed by

20

many studies, that if freedom is given to this person before he reaches middle age he will repeat the violent crimes he has committed. That price for his freedom is too high. You stand between this man and the brutality with which he will treat other people." The male victim also wrote, "I sincerely believe that if he is not sentenced to many years in jail, he will again commit horrific crimes, and in the future, he may not allow the victims to live. I feel a deep responsibility to call the attention of the legal system to this danger, and the court has a deep responsibility to ensure that others are not endangered by this man." Andfinally, he wrote, "there is no doubt that each of these men is capable of murder. Please do not allow these men to hurt or to kill others."

The PSR, of course, is available and part of the record. But if the written statements of the victims did not sufficiently set forth the circumstances and effect of Queensborough's crime, these victims felt so strongly about the sentencing that, unlike most victims of rape who shun further contact with the case once the trial is over, they both returned for the sentencing hearing and gave their statements in person and in the presence of the court. Those statements are included as an Appendix to this opinion. We find nothing in the Jacobs opinion that is comparable.

The District Court was not unaware of the need to articulate the reasons for the upward departure to the extent it chose, but apparently believed, with good reason, that it was apparent from the record that had just been made. Thus, in sentencing Queensborough, the District Court, having just heard the moving and explicit statements of both victims, made in open court, stated at the outset:

> THE COURT: Mr. Queensborough, I don't know that there's a whole lot I can say to you, other than what [the female victim] and [the male victim] have very eloquently told you right now.
>
> . . .
>
> The cases alluded to by your counsel earlier are different, they are distinguishable from this, while they

21

were certainly very bad and dangerous and brutal, but
they do not reach the level of brutality that you did to
these two people.

Not only do I think that it is, that sentencing you on
the high . . . end of the guidelines is appropriate, I
think that it does warrant departure upward.

The court stated that "this case is totally senseless . . . . So
I think that this is one of those instances where the Court
is justified in departing upward." After confirming with the
U.S. Attorney that "the maximum sentence for this is life,"
the court imposed the sentence of 20 years on Count 1 and
the mandatory 5 years on Count 2.

The Supreme Court has made it clear that we are to
afford substantial deference to a District Court's sentencing
decision:

> A district court's decision to depart from the Guidelines
> . . . will in most cases be due substantial deference, for
> it embodies the traditional exercise of discretion by a
> sentencing court. Before a departure is permitted,
> certain aspects of the case must be found unusual
> enough for it to fall outside the heartland of cases in
> the Guideline. . . . Whether a given factor is present to
> a degree not adequately considered by the Commission,
> or whether a discouraged factor nonetheless justifies
> departure because it is present in some unusual or
> exceptional way, are matters determined in large part
> by comparison with the facts of other Guideline cases.
> District courts have an institutional advantage over
> appellate courts in making these sorts of
> determinations. . . .

Koon, 518 U.S. at 98 (citation omitted).

Applying this substantial deference, we conclude that the
District Court did not abuse its discretion in departing
upwards to the degree it did in this case. In setting
Queensborough's sentence, the court compared his conduct
to that of other criminal defendants referred to by defense
counsel during argument, and stated: "[t]he cases alluded
to by your counsel earlier are different . . . while they were
certainly very bad and dangerous and brutal . . . they do

22

not reach the level of brutality that you did to these two people." App. at 94. The court then identified the maximum possible sentence for Queensborough's crime, life imprisonment, and imposed a sentence of twenty years. The District Court heard the allocution by both attorneys, by the two victims, and by Queensborough himself. It was in the best position to determine whether a departure was warranted and, if so, the extent of the departure, and we are not inclined to replace its judgment with our own.

III.

CONCLUSION

For the reasons set forth, we will affirm the judgment of conviction and sentence.

APPENDIX

STATEMENT OF FEMALE VICTIM AT SENTENCING
HEARING

When asked if I wished to come here to make a
statement, I initially thought that I would not want to do
so, because I thought it would be very hard to talk about
what happened, and I worried I would embarrass myself by
crying.

And it struck me that the worst, if I did cry, I would be
embarrassed, is a very different result from the threat of
that night when we were attacked by this man. He said to
me, "You cry, you die."

I chose to come here because although you can read the
accounts of what happened that night, you cannot know
how it felt for me to sit with a friend on a beautiful
Valentine's Day night, and suddenly become prey to brutal
predators who would show us repeatedly that our lives no
longer had value, and that they could be taken at any time.

You can read medical reports, but you can't know that
during the attack, there came a time when it hurt so badly
I considered fighting, even if it meant my life, because I
didn't think they could kill me any more dead that I already
felt inside.

However, this was not a choice I could make at that time.
It was something I could not do. I couldn't forfeit what little
chance my friend had for survival.

You can read of our escape, but I want you to know from
me, it was terrifying to feel like a hunted animal, going over
the lava rocks and cactus and dark hillside.

I have never in my entire life had anything as devastating
as this happen. This has invaded every portion of my life.

I tried to think of how best to explain to you how invasive
this has been, and I thought maybe if I shared that I cried
every day for months and months and months, that I've
had continuing nightmares made up of the memories of
that night, from which I awaken screaming. And this goes

24

on, the continuing months of counseling to try to work
through my confused emotions and fears.

That for many months I experienced a loss of the ability
to focus on meditation or prayer, without becoming
distracted by reliving the horror of that night.

That lack of ability to focus has affected other activities
I previously enjoyed, simple things like reading and
watching TV, or basket weaving or quilting.

The embarrassment of the exasperating jumpiness with
which I react to unexpected movement toward me.

Waiting in terror for AIDS and pregnancy testing.

For months I was unable to go out at night, which for me
meant no longer taking any night classes or seeing the
beauty of the stars, or being on the beach.

Having to come back, feeling sick to my stomach when I
am too closely surrounded by strangers, which made
ordinary events like rejoining my exercise class, or even
going to my own church, too difficult for many months.

Activities where strangers were close by remain very
difficult for me. I find it hard to remember that I once could
enjoy a simple even[ing] out dancing with a group of friends
or going to an amusement park for the day.

The loss of opportunity, the promotion that disappeared
when the administrator found out what had happened to
me. The staff, who did not know what happened, couldn't
understand why the promotion had suddenly disappeared
and was not mine. I did not have the energy to argue on my
own behalf with regards to this.

The loss of friends and close family, who could not have
handled this, and who can't handle the continuing
difficulties that this presents.

The sadness and pain of seeing my closest friends hurt
by the fact that I was hurt. I am finding that this having
happened to me continues to hurt those people with whom
I become close.

The horror, shame and embarrassment when news of
this appeared in newspaper and on TV programs. The fact

25

that names were withheld did not disguise that that was
me.

The difficulty of trying to handle the everyday events of
life while dealing with this. I can barely recall large events,
like moving, other than extreme upset over small, minor
things like a scratch from a cardboard box that reminded
me of the scratches received from the lava rocks, from the
attack that night.

And the fear that I would burst into tears over nothing in
front of people who would not have understood why I was
reacting in such a way.

The expense, which now amounts to thousands of
dollars, for ongoing counseling, medical exams, testing,
replacing things destroyed or lost.

My life has gone on, but much of what made my life
happy and worth living was not available to me for many
months, and in some ways may never return.

I was asked if I wanted to be compensated for the money
that was stolen from me. I think that money was minor. I
want returned to me my happy spirit.

And I know bad things to happen, but I did not know
that evil like this existed. I know you cannot return this to
me, but if you delay this happening to others, the price
others have to pay for this person's freedom is too high.

You stand between this man and the brutality with which
I firmly believe he will treat other people. I beg you to
protect other men and women from this.

This finally is what this has brought me to. I base my
entire philosophy on personal freedom, and yet I must ask
that you limit this man's freedom for as long as the law
allows you to do so, in order that the freedom of other
people may be preserved.

26

STATEMENT OF MALE VICTIM AT SENTENCING
HEARING

I'm thinking about what I can offer to you as you think
about sentencing Mr. Queensborough. I need to pass on to
you a bit of the horror of the night that we experienced.

I can't talk to all the details of that night, and I won't, but
a bit of it I think you need to feel and to be aware of.

Right after Mr. Queensborough had himself just finished
raping [female victim], he held me down on the ground with
a gun at my face and to my head, and he threatened
repeatedly to kill us.

And as he went on and on in his state and threatening
manner, he said some things that were deeply disturbing
and that were very revealing about him.

He said, "Do you know why I'm doing this to you, why I'm
going to hurt you?"

He said, "Because I've been in jail and I've been hurt. I
don't care. I'm going to hurt you."

And I laid there on the ground, trembling, thinking this
is a person who doesn't care about himself, he has got no
respect for himself, he has got no respect for others. He has
no respect for human life. And this is the person that's
holding a gun to my head and threatening to kill us, and he
has just finished raping [female victim]. It was deeply
disturbing and very shocking, and I lay there trembling.

Somehow in his mind I believe that he rationalized what
he was doing to us, because he had been hurt in his life.
He said very directly that he had killed other people, and
that it would mean nothing to him to kill us.

At that moment, and as a result of that whole night, my
sense of security in life was shattered. I have been lucky in
my life, surrounded with a lot of love and caring, and I
never faced, I've never faced anyone who had such a lack
of respect for life.

I've come to know a little bit of the sense of fear that
many people go through in life, particularly women, and
not being safe to walk, not being safe to be alone, the

27

horror of panic, see them for real, and some of them are basically based on the horror of that night.

He said all this to me having just raped [female victim], and it was very clear, I know in my heart not only was he capable of raping, which he did, but that he was very capable of murder as well, of killing.

We were incredibly fortunate to survive that night. We didn't meet his anger or that of the other assailant. We didn't meet their hatred. And in not meeting that, I believe we stopped them from killing us.

I have no doubt in my heart, I know that he is capable of killing and capable of rape, and I believe that given the opportunity it will happen again, and that next time the victims will not survive. In fact, I believe that most people would not have lived through that. I feel very fortunate, to myself and to [female victim], that we found a way to survive and to try to heal afterwards.

So that's why I'm here today, to talk to you about his sentencing. There's absolutely no sense of – – I have no interest at all in punishment. I have no pleasure at all thinking about Mr. Queensborough going to jail. In fact, I think it's tragic. I think it's very tragic, that since he is such a young a man, can be so filled with hatred and horror, his life so out of control that he can commit crimes that mean that he is not safe to be around other people.

So when I think about what I think is appropriate for his sentencing, all I think about is the safety of others, that no one, there's not a person alive that should have to feel what we felt, that should have to fight for their lives the way we had to fight. And I believe that he will hurt others again, and that as a result the Court needs to sentence him to the maximum amount of sentence that is allowable.

Again, I think it's tragic. There's nothing that I hate more than the idea of anyone leading their lives like that. But the safety of others is what I have to keep in mind, and that's why I came here today.

Thank you for listening and considering that in deciding on his sentencing . . . .

28

STAPLETON, J., concurring in part and dissenting in part:

I agree with my colleagues that the government did not breach the plea agreement. The prosecutor expressly advised the Court that the government had committed itself to recommend a sentence within the Guidelines range and that its recommendation was a sentence at the upper end of the range. In this context, the prosecutor's comment about "an aggravating factor" could not have communicated to the Court that the government was recommending a departure. Nevertheless, I would remand for resentencing.

Queensborough was charged with conduct constituting "aggravated sexual abuse" under 18 U.S.C.S 2241 which, like the Virgin Islands rape statute, carries a maximum sentence of life imprisonment.1 The applicable provision of the Guidelines is S 2A3.1, which provides a base offense level of 27 for "sexual abuse" as defined in 18 U.S.C. S 22422 and specifies "Specific Offense Characteristic" upward increases for various aggravating circumstances. A four-level increase is required, for example, if a dangerous

_____

1. Section 2241 provides in relevant part:

    (a) By force or threat. -- Whoever, in the special maritime and
    territorial jurisdiction of the United States or in a Federal
prison,
    knowingly causes another person to engage in a sexual act --

    (1) by using force against that other person; or

    (2) by threatening or placing that other person in fear that any
    person will be subjected to death, serious bodily injury, or
    kidnaping;

    or attempts to do so, shall be fined under this title, imprisoned
for
    any term of years or life, or both. . . .

2. Section 2242 provides in relevant part:

    Whoever, in the special maritime and territorial jurisdiction of
the
    United States or in a Federal prison, knowingly--

    (1) causes another person to engage in a sexual act by threatening
    or placing that other person in fear (other than by threatening or
    placing that person in fear that any person will be subjected to
    death, serious bodily injury, or kidnaping); . . .

or attempts to do so, shall be fined under this title, imprisoned not more than 20 years, or both.

weapon is used or displayed. An additional four-level
increase is mandated if the victim is abducted, and still
another four-level increase is called for if the victim
sustained permanent or life-threatening bodily injury.3
Application Note 5 to S 2A3.1 makes a cross reference to
S 5K2.8 (departure for "extreme conduct"), which authorizes
an upward departure for conduct that is "unusually
heinous, cruel, brutal or degrading to the victim." The
Application Note suggests, by way of example, that an
upward departure under S 5K2.8 may be appropriate when
the victim is sexually abused by more than one participant.

Queensborough's sentencing judge adopted the Guideline
calculations suggested in the Presentence Report ("PSR"): a
Base Offense Level of 27 followed by a four-level increase
for use of a gun, a four-level increase for abduction, a two-
level decrease for acceptance of responsibility, and a one-
level decrease for timely notifying the authorities of his
intention to plead guilty. This calculation resulted in a total
offense level of 32 and, given Queensborough's Criminal
History Level, a sentencing range of 121 to 151 months.
Queensborough does not challenge this calculation. The
Court went on, however, to depart upward and to impose a

_____

3. U.S.S.G. 2A3.1(b) provides:

> (b) Specific Offense Characteristics
>
> (1) If the offense was committed by the means set forth in 18
> U.S.C. S 2241(a) or (b) (including, but not limited to, the use or
> display of any dangerous weapon), increase by 4 levels;
>
> (2) (A) If the victim had not attained the age of twelve years,
> increase by 4 levels; or (B) if the victim had attained the age of
> twelve years but had not attained the age of sixteen years,
> increase
> by 2 levels.
>
> (3) If the victim was (A) in the custody, care, or supervisory
> control
> of the defendant; or (B) a person held in the custody of a
> correctional facility, increase by 2 levels.
>
> (4) (A) If the victim sustained permanent or life-threatening
> bodily
> injury, increase by 4 levels; (B) if the victim sustained serious
> bodily
> injury, increase by 2 levels; or (C) if the degree of injury is
> between
> that specified in subdivisions (A) and (B), increase by 3 levels.

(5) If the victim was abducted, increase by 4 levels.

sentence of 240 months, the equivalent of at least afive-level increase above the total offense level of 32. Queensborough challenges the propriety of both the departure and the extent thereof.

As the District Court recognized, an upward departure was permissible only if Queensborough's conduct was heinous, cruel, brutal or degrading to a degree not adequately taken into account by S 2A3.1 in a situation where the rape involved an abduction and use of a deadly weapon. The Court concluded that Queensborough's conduct was "unusually degrading to the victim" because "one victim [was] forced to have sex with another victim," App. at 113, and, based solely upon this finding, departed upward five levels. Like my colleagues, I agree that the directive to the two victims could properly support an upward departure. I would not affirm the District Court's sentence, however, because no notice was given that a departure on this ground was being considered and because the sentencing judge provided no explanation for the degree of his departure, a five-level, 89 month increase.

In Burns v. United States, 501 U.S. 129 (1991), the Court pointed out that Federal Rule of Criminal Procedure 32, as amended by the Sentencing Reform Act, "provides for focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence." Id. at 134 (emphasis supplied). Rule 32 does this in part by affording the defendant and the government the opportunity to comment on "matters relating to the appropriate sentence." Id. at 134. The Supreme Court concluded in Burns that Rule 32 contained an implicit requirement that the defendant receive notice that"an upward departure will be at issue and of the facts that allegedly support such a departure." Id. at 135 (emphasis supplied). As the Court explained:

> In the ordinary case, the presentence report or the Government's own recommendation will notify the defendant that an upward departure will be at issue and of the facts that allegedly support such a departure. Here we deal with the extraordinary case in which the district court, on its own initiative and contrary to the expectations of both the defendant and

31

the Government, decides that the factual and legal predicates for a departure are satisfied. The question before us is whether Congress, in enacting the Sentencing Reform Act, intended that the district court be free to make such a determination without notifying the parties. We believe that the answer to this question is clearly no. . . .

 As we have set forth, Rule 32 contemplates full adversary testing of the issues relevant to a Guidelines sentence and mandates that the parties be given"an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence." Fed. Rule Crim. Proc. 32(a)(1). Obviously, whether a sua sponte departure from the Guidelines would be legally and factually warranted is a "matte[r] relating to the appropriate sentence." In our view, it makes no sense to impute to Congress an intent that a defendant have the right to comment on the appropriateness of a sua sponte departure but not the right to be notified that the court is contemplating such a ruling.

Burns, 501 U.S. at 135–36 (emphasis supplied).

The only fact noted in the PSR under the heading "Factors That [Might] Warrant Departure" was the fact that the "victim was sexually abused by more than one participant." The only fact mentioned by the government at the sentencing hearing as possibly warranting a departure was the fact that "there's more than one victim." Understandably, in this context, defense counsel made no comment during his allocution on whether the order directing the victims to have sex was sufficiently degrading to warrant a departure and, if so, how large that departure should be.

My colleagues distinguish Burns on the ground that the PSR here mentioned the directive to have sex in its ten-page, narrative account of all of the circumstances of the offense and cited to S 5K2.8, the Guideline section under which the District Court ultimately departed. Neither portion of the PSR, however, gave fair notice of the factual basis for the departure utilized by the Court.

32

While the PSR did cite to the Guideline under which the Court ultimately departed and thus referenced the"legal predicate" for the departure that ultimately occurred, that Guideline is so broad that it provided no hint in this context of the "factual predicate" that the Court was considering. Indeed, the PSR's citation to S 5K2.8 came in support of a suggested factual basis for departure wholly different from the one adopted by the District Court. Similarly, the PSR's narrative account included all the facts related to the crime and did nothing to dispel the idea that the only basis for departure being considered was that there were two perpetrators.

In addition to adopting a novel ground for departure, the District Court provided no clue as to why it decided that a five-level departure was warranted. The Court simply noted that the maximum penalty authorized by the statute was life and then imposed a sentence of 20 years. My colleagues understandably believe that the extent of the District Court's departure was determined by reference to the relationship between a total sentence of twenty years and the maximum sentence provided by law, i.e., life. If so, the District Court erred. As my colleagues acknowledge, even when sentencing for an assimilated crime, a district court must still base its sentence on the Guidelines. If the congressionally intended uniformity is to be achieved, it is the value system of the Guidelines to which the sentencing judge must adhere.

In United States v. Kikumura, 918 F.2d 1084 (3d Cir. 1990), we held that once a reviewing court concludes that a departure is permissible, it must still determine whether the degree of departure was reasonable. While we recognized that "[a]t this stage of the inquiry, our review is deferential," id. at 1098, we stressed that "there must be some objective standards to guide the determination of reasonableness," id. at 1110, and that"standardless determinations of reasonableness [would] inevitably produce unwanted disparity." Id. at 1113. We concluded that the primary source of those objective standards must be the Guideline scheme itself. At the same time, we recognized that those standards will often be discernable in the Guidelines only by way of analogy and that " analogies

33

to the guidelines . . . are necessarily more open-textured than [direct] applications of the guidelines." Id. at 1113.

In United States v. Jacobs, 167 F.3d 792 (3d Cir. 1999), we found implicit in Kikumura a requirement that a sentencing judge, when departing from the guideline range, "articulate the reasons for the degree of the departure." Id. at 798. In the absence of such an explanation or some other indicia in the record, it is impossible to determine whether the District Court has conducted the required analysis. Under Jacobs, where the reasonableness of the degree of the departure is not otherwise apparent from the record, a failure to provide an explanation requires a remand for resentencing. As will be apparent from the following discussion, I believe the reasonableness of the degree of departure in this case is not apparent from the record and that our precedents, accordingly, dictate a remand for resentencing.

Consistent with our prior approach in comparable cases, I would not dictate to the District Court the rationale that it should utilize on remand in determining the degree of departure. It is appropriate under our precedents, however, to point out provisions of the Guidelines that the District Court might wish to consider in making that determination. See Jacobs 167 F.3d at 800-01.

I would commend to the District Court for its consideration our decision in Jacobs. The defendant there was charged with aggravated assault on his former girlfriend with a knife on federal property. Section 2A2.2, the aggravated assault guideline, provided for a base offense level of 15 and for enhancements, inter alia, for use of a dangerous weapon (4 levels), and infliction of "Serious Bodily Injury" (4 levels), or "Permanent or Life-Threatening Bodily Injury" (6 levels).4 The sentencing court added four

_____

4. U.S.S.G. S 2A2.2(b)(3) provides:

    (b) Specific Offense Characteristics

    *  *  *

    (3) If the victim sustained bodily injury, increase the offense level
    according to the seriousness of the injury:

34

levels for the use of a knife and six levels because the victim sustained permanent physical injuries. In addition, it departed upward five levels under U.S.S.G. S 5K2.3, which authorizes a departure when "extreme psychological injury" has been inflicted on the victim.5

As heretofore noted, we remanded for resentencing because the sentencing judge failed to explain how it selected a five-level departure and because the reasonableness of that choice was not obvious from the record and the Guidelines. In the course of our opinion, we pointed out that the Guidelines provided a basis for inferring that in an aggravated assault context, physical and non-physical injuries to the victim should be treated as being of substantially similar seriousness. Based on that inference, we suggested that in departing for a non-physical injury, the court should be guided by the degree of increase mandated for a comparable physical injury:

> Under S 1B1.1(j), "serious bodily injury" includes the "protracted impairment of . . . [a] mental faculty." Under S 1B1.1(h), "permanent or life-threatening bodily injury" includes a "substantial impairment of[a] mental faculty that is likely to be permanent." These

_____

> Degree of Bodily InjuryIncrease in Level
>
> (A) Bodily Injury add 2
> (B) Serious Bodily Injuryadd 4
> (C) Permanent or Life-Threatening
> Bodily Injuryadd 6
>
> (D) If the degree of injury is between that specified in subdivisions (A) and (B), add 3 levels; or
>
> (E) If the degree of injury is between that specified in subdivisions (B) and (C), add 5 levels.
>
> Provided, however, that the cumulative adjustments from (2) and (3) shall not exceed 9 levels.

5. U.S.S.G. S 5K2.3 provides in part:

> If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense,
> the court may increase the sentence above the authorized guideline range.

35

definitions do not, as Jacobs argues, mean that in an aggravated assault context, S 2A2.2(b) takes into account all of the extraordinary psychological injuries covered by S 5K2.3. . . . They may, however, provide a basis for inferring that the guidelines in an aggravated assault situation treat physical and non-physical injuries to a victim as being of substantially similar seriousness. If one draws such an inference, one may further conclude that it would be inconsistent with the approach of the Guidelines to depart upward four levels or more under S 5K2.3 without finding that the extreme psychological injury was likely to be protracted. Conversely, one may conclude that it would be consistent with the approach of the Guidelines to depart upwards four levels if there is "extreme psychological injury," as defined in S 5K2.3, that can be expected to be "protracted" but not "permanent."

Jacobs, 167 F.3d at 801.

Section 2A3.1 (the sexual abuse guideline), likeS 2A2.2 (the aggravated assault guideline), provides a base offense level and, inter alia, calls for increases depending on whether "serious bodily injury" or "permanent or life-threatening injury" was inflicted on the victim. "Serious bodily injury" and "permanent or life-threatening injury" for purposes of both sections include impairment of a"mental faculty." Section S 5K2.8 (departure for"extreme conduct"), like S 5K2.3 (departure for "extreme psychological injury"), authorizes an upward departure where an extraordinary non-physical injury is inflicted, i.e., where the victim is subjected to unusually degrading conduct. Although S 2A3.1 deals with sexual abuse rather than assault and, accordingly, specifies a substantially higher base offense level, Jacobs's teachings may be helpful in determining a reasonable degree of departure here.

As we have noted, if the victim in a sexual assault sustains "permanent or life-threatening bodily injury," S 2A3.1(b) dictates a four level increase in the offense level. If bodily injury is sustained that is neither "permanent" nor "life-threatening," but nevertheless serious, a two or three level increase is required. If one who inflicts non-physical injury in the course of a sexual assault is to be treated as

36

having culpability equal to that of one who inflicts comparable physical injury, it would appear unreasonable, in the absence of a persuasive explanation, to depart more than four levels in a situation like that before us or to depart more than three level without finding that the harm to the victim was life threatening or left continuing effects.

I would also commend for the District Court's consideration the portion of our Kikumura opinion that discusses situations where the conduct giving rise to a departure is itself a crime independent of the offense charged. See Kikumura, 918 F.2d at 1112. We there suggested that it would ordinarily not be reasonable to choose a degree of departure that would result in the defendant's receiving more total punishment than he would have received if he had been charged and convicted of both offenses. Here the conduct giving rise to the departure was an independent violation of 18 U.S.C. S 2241; when Queensborough ordered the two victims to have sex, he "knowingly [attempted to] cause . . . another person to engage in a sexual act . . . by threatening serious bodily injury." If he had been prosecuted for both offenses, they would each have had a total offense level of 32. Because there was an additional victim of the second crime, they would not have been grouped together and the combined offense level, under S 3D1.4, would have been 34. This produces a Guideline range from 151 to 188 months, a range substantially below the 240 months imposed here.

I would stress, as we did in Jacobs, that the District Court would be free on remand to elect a different approach to determine what is a reasonable degree of departure on the facts of this case. I would, however, insist on a clear articulation of the reasons supporting the District Court's ultimate decision on an appropriate sentence.6

_____

6. The Court's appendix and its recitation of the details of the offense and its impact on the victims powerfully communicates the character of the sexual abuse in this case. To the extent they are included in response to my dissent, however, they miss the point. The issue for me is not whether this record will support an upward departure or even whether it could justify a five-level upward departure.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

The sentencing judge in this case was required by 18 U.S.C.
S 3553(c)(2) to state "the specific reason" for his departure in open
court
and in the court's judgment. In open court, the judge stated:

> As is recited in the Presentence Report, and so that counsel had
> notice, Paragraph 92, according to the basic Sentencing Guideline
> that applies here for criminal sexual abuse, an upward departure is
> warranted if the victim was sexually abused by more than one
> participant, and as well under Section 5(k)(2.8), which deals with
> extreme conduct.

> And it says, if the defendant's conduct is unusually heinous,
> cruel, brutal or degrading -- well, for a rape, I don't know that

it

> qualifies as unusually heinous, cruel or brutal; however, to then
> order the two victims to have sex themselves, in your presence, at
> the point of a gun, is unusually degrading. So I'm not going to
> prolong it any longer."

App. at 95. In its judgment, the Court stated:

> The sentence departs from the guideline range for the following
> specific reason(s): Extreme conduct pursuant to 5k2.8. The Court
> finds defendant's conduct was unusally (sic) degrading to the

victim.

> One victim forced to have sex with another victim.

App. at 113.

It is thus unmistakably clear why the District Court departed. The
problematic issues result from the fact that the Court gave no notice that
it was considering a departure on that ground and the fact that it gave
no explanation as to why it thought the order to have sex deserved
punishment beyond that which could have been imposed based on a
finding of permanent physical or psychological injury to the victims.

38