**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2461
_____

UNITED STATES OF AMERICA

v.

SCOTT HORNICK,
a/k/a SCOTT KENNEDY,
a/k/a STEVEN INGARDI,
a/k/a JERRY TODISCO,
a/k/a GLENN KENNEDY

Scott Hornick,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2:08-cr-00412-003)
District Judge: Honorable Harvey Bartle, III

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 24, 2012
_____

Before:  AMBRO, CHAGARES, and HARDIMAN, <u>Circuit Judges</u>.

(Filed: July 3, 2012)

_____

OPINION
_____

CHAGARES, Circuit Judge.

For nearly six years, appellant Scott Hornick led a group that burglarized retail establishments up and down the East Coast and transported the stolen goods across state lines for unlawful resale. In February 2010, a federal jury convicted Hornick of multiple counts related to his participation in the burglaries. Hornick contends that his conviction was in error because the Government violated his rights under the Interstate Agreement on Detainers and because he was prejudiced by trial testimony about his appearance on the television program *America's Most Wanted*. Hornick also challenges the conspiracy count charged in the indictment and objects to the District Court's severance of certain conspiracy evidence in its jury charge. Finding no merit in these claims, we will affirm.

I

We write solely for the parties' benefit and recite only the facts essential to our disposition. From August 2001 to July 2007, Hornick orchestrated a sustained spree of burglaries in 13 East Coast states. Shortly after escaping from prison in August 2001, he reconnected with a prior acquaintance, Vallin Malcom, who sold stolen merchandise on the black market. Working with Rene and Rolando Moran (hereinafter the Moran brothers), Hornick burglarized high-end electronics stores and sold the stolen goods to Malcom. Hornick and the Moran brothers were arrested in New Jersey in October 2002 after robbing a Circuit City electronics store and leading police on a high-speed car chase. After giving police a false name and fake identification, Hornick was released on bail. He immediately roped two prior acquaintances, Jerry Todisco and Sasha Ingardi, into committing burglaries with him. Jerry's brother, Anthony Todisco, joined the group

2

soon thereafter. The collaborators operated just as before, burglarizing high-end businesses and reselling the stolen goods to Malcom. The Todisco brothers participated until they were arrested in December 2004. Hornick and Ingardi operated until Delaware state police arrested them in July 2007.

A federal grand jury returned a ten-count superseding indictment against Hornick on June 11, 2009, a second superseding indictment on October 8, 2009, and a third superseding indictment on January 3, 2010. Count 1 of the third superseding indictment alleged conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371; counts 2 through 7 alleged six distinct violations of the statute prohibiting interstate transportation of stolen property valued over $5000, 18 U.S.C. §§ 2314 and 2; count 8 alleged conspiracy to burglarize pharmacies in violation of 18 U.S.C. § 2118(d); and counts 9 and 10 alleged pharmacy burglary in violation of 18 U.S.C. § 2118(b). The District Court held a trial from February 8 to 22, 2010. The jury found Hornick guilty of the crimes charged in counts 1 through 8 and found him not guilty on the crimes charged in counts 9 and 10. The District Court sentenced Hornick to 27 years in prison, followed by three years of supervised release, and set restitution at $1,788,291.58. Hornick timely appealed.[1]

## II

Hornick's first claim is that he was entitled to dismissal of all charges against him because the Government violated his rights under the Interstate Agreement on Detainers

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

("IAD"), 18 U.S.C. App. 2, §§ 1-9. To analyze this claim, we must first recount relevant portions of Hornick's criminal history, and we then turn to the merits of the challenge.

A

Hornick's criminal record began years before the crimes at issue in this case. On March 18, 1998, he pleaded guilty to conspiring to transport stolen property across state lines in the United States District Court for the Eastern District of Pennsylvania. District Judge William Yohn sentenced him to 27 months in prison, followed by three years of supervised release, and ordered him to pay $76,500 in restitution. After completing his prison sentence, Hornick absconded from supervised release. This prompted the District Court to issue a warrant directing Hornick to appear before the court for a hearing on revocation of supervised release. Hornick subsequently was arrested by New Jersey officials on a state parole violation and was sentenced to 270 days in prison.

Hornick escaped from state prison on August 6, 2001 and remained at large until Delaware state police arrested him in July 2007. Delaware authorities charged Hornick with various drug, burglary, and false identification crimes. He attempted to escape, unsuccessfully, in December 2007. In February 2008, he pleaded guilty to forgery, receiving stolen property, possession of burglar's tools, and attempted escape. In June 2008, he pleaded guilty in Delaware court to a separate burglary charge. He had completed his various terms of imprisonment for the state crimes when, in August 2008, he appeared before Judge Yohn in the United States District Court for a hearing on revocation of supervised release. Hornick stipulated to violating his supervised release

4

(on the 1998 conviction) and Judge Yohn sentenced him to two years in federal prison, followed by one year of supervised release.

Nine months later, the Court of Common Pleas for Bucks County, Pennsylvania issued two writs of habeas corpus *ad prosequendum* directing federal custodians to release Hornick temporarily for trial on pending burglary charges. Federal officials agreed and transported Hornick to Bucks County for arraignment and trial. He was in state custody on June 11, 2009 when the federal grand jury returned the superseding indictment against him in this case.

District Judge Harvey Bartle, III, presiding over the superseding indictment, issued a writ of habeas corpus *ad prosequendum* on June 16, 2009 to secure Hornick's return to federal custody. Trial on the Bucks County burglary charges had not yet begun. In compliance with the writ, Pennsylvania officials released Hornick back to federal custody, and Hornick made an initial appearance on June 26, 2009. He pleaded not guilty and agreed to remain in pretrial detention. In connection with his pretrial detention stipulation, the Magistrate Judge asked, "[I]t's my understanding that you're agreeing to detention in this case, correct?" Appendix ("App.") 165. Hornick answered, "Yes . . . contingent upon being returned to Bucks County . . . to state custody." Id. The Magistrate Judge then confirmed that Hornick had signed "the waiver" and stated, "I will order that you be detained pending the disposition of this case in the District Court. I understand that you've signed the waiver and we expect you to go back to the County facility." Id. at 165-66.

5

The spoken-of "waiver" referred to a waiver form titled "Waiver of Detainers Act." In it, Hornick affirmed that he had been "advised of [his] rights under the Interstate Agreement on Detainers Act" and that he "waive[d his] right to remain in temporary federal custody during the pendency of the criminal prosecution . . . and request[ed] that the United States Marshal return [him] to the jurisdiction with original custody." Hornick Waiver of June 26, 2009.

When federal officials did not, in fact, return Hornick to Pennsylvania custody, he moved to dismiss the charges. He argued that the IAD required the Government to comply with his request to return to state custody. The District Court denied the motion, reasoning that the IAD did not protect Hornick because "[t]he Act . . . does not apply to pretrial detainees" and Hornick had not "produced any evidence that he was serving a sentence in state court at the time he was transferred to federal custody." App. 26.

B

The Interstate Agreement on Detainers is an interstate compact entered into by 48 States (among them, Pennsylvania), the federal Government, and the District of Columbia. 18 U.S.C. App. 2, § 2; 42 Pa. Cons. Stat. § 9101. It creates uniform procedures for resolving one State's pending charges against an individual imprisoned by another State. Alabama v. Bozeman, 533 U.S. 146, 148 (2001); New York v. Hill, 528 U.S. 110, 111 (2000). Article III extends to prisoners against whom a detainer is lodged the right to demand final disposition on the pending charges within 180 days of release to the charging jurisdiction unless good cause exists for a continuance. 18 U.S.C. App. 2, §

6

2, Art. III(a).[2]  Article IV gives "the jurisdiction in which an untried indictment, information, or complaint is pending" the right "to have a prisoner against whom" it "has lodged a detainer . . . made available" for trial.  Id. Art. IV(a).  If it secures custody of the prisoner, the State that lodged the detainer (the "receiving state") must bring the prisoner to trial within 120 days.  Id. Art. IV(c).  An "anti-shuttling provision" further requires the receiving state to retain custody of the prisoner until disposition of the charges.  Id. Art. IV(e).  Absent a waiver, transfer of the prisoner back to the sending state results in dismissal, with prejudice, of the charges pending in the receiving state.  Id.; see Bozeman, 533 U.S. at 156 (holding that the IAD commands dismissal of charges even for a one-day transgression of the anti-shuttling provision).

Hornick began as a federal prisoner serving time for violating his supervised release in a federal sentence.  That is, his "original place of imprisonment" was federal prison.  18 U.S.C. App. 2, § 2, Art. IV(e).  Pennsylvania assumed custody of Hornick and sought to bring him to trial pursuant to a writ of habeas corpus *ad prosequendum*.  But, having never proceeded to trial and been found guilty on the Bucks County charges, Hornick never was a Pennsylvania "prisoner."  Id. Art IV(a).  When the federal

_____

[2] A detainer is "a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime."  Bozeman, 533 U.S. at 148.  It is a form of legal process distinct from a writ of habeas corpus *ad prosequendum*.  United States v. Mauro, 436 U.S. 340, 358 (1978).  A detainer "puts the official of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison.  Further action must be taken by the receiving State in order to obtain the prisoner."  Id.  By contrast, a writ of habeas corpus *ad prosequendum* directs prison officials to make the prisoner available immediately for trial.  Id. at 357-58.  A court that issues a writ of habeas corpus *ad prosequendum* need not have lodged a detainer in order to secure the presence of the prisoner.

7

Government regained custody of him, it did so pursuant to its own writ of habeas corpus *ad prosequendum*. It never lodged a detainer with Bucks County, nor did it need to, in order to reacquire custody of its own prisoner. United States v. Jones, 938 F.2d 447, 449 (3d Cir. 1991). Because the Government did not file a detainer, the IAD was never triggered and its protections never covered Hornick.

Hornick's arguments to the contrary misconstrue the reach of the IAD and muddle the distinction between detainers and writs of habeas corpus *ad prosequendum*. He contends that his waiver of rights under the IAD transformed the Government's writ of habeas corpus *ad prosequendum* into a detainer. It appears that the Magistrate Judge's statements to Hornick suggested, incorrectly, that he had the power to order Hornick's return to state custody. But neither the waiver nor the Magistrate's comments can convert the Government's writ into a detainer. The Supreme Court has emphasized that writs of habeas corpus *ad prosequendum* and detainers are distinct forms of legal process, with different purposes, histories, and effects on prisoners. United States v. Mauro, 436 U.S. 340, 357-61 (1978); see also Jones, 938 F.2d at 449. Having failed to introduce evidence of a federal detainer, Hornick has no IAD claim against the United States.[3]

Hornick next contends that his transfer from federal prison to Bucks County authorities triggered the IAD. If this is so, Hornick has a claim against Pennsylvania, not

---

[3] This result aligns with the IAD's purpose to combat the detrimental effects of lingering detainers, such as interruption of prisoner rehabilitation and sentencing distortions. Mauro, 436 U.S. at 359-60. When the United States secures custody of a detainee by means of a writ of habeas corpus *ad prosequendum*, "the problems that the Agreement sought to eliminate do not arise." Id. at 361.

the United States.  He also argues that he was a sentenced state prisoner when he was transported from Bucks County back to the United States.  He is incorrect; at that point in time, he was serving a federal sentence, but was a pretrial detainee with respect to Pennsylvania.  The District Court properly denied Hornick's motion to dismiss, for the federal Government did not transgress the IAD.

III

Hornick's second claim is that the District Court abused its discretion when it denied his motion for a mistrial after a witness alluded to his appearance on the television show *America's Most Wanted*.  "We review the denial of a motion for a mistrial based on a witness's allegedly prejudicial comments for an abuse of discretion."  United States v. Lore, 430 F.3d 190, 207 (3d Cir. 2005).

On the fourth day of the trial, the Government called Malcom, the coconspirator who purchased goods stolen by Hornick and the other conspirators, to testify.  During cross-examination, defense counsel asked Malcom, "Did you tell the Government that you never thought of Hornick as a bad guy and if you knew what Malcom — if you knew what Hornick had been associated — been involved in, you never would have associated with him?"  App. 1105-06.  Malcom responded, "I probably said that Scott was, as far as I knew, was a good guy, always felt that he was okay, but when I found out that he was Americas most wanted," at which point defense counsel interjected.  Id.  The jurors' reactions to Malcom's slip prompted defense counsel to move for a mistrial.  The District Court denied the motion, but gave the jury the following cautionary instruction:  "Vallin Malcom was asked at one point about his opinion of the Defendant.  In this context, he

9

characterized the Defendants as one of America's Most Wanted. His comment is total[ly] irrelevant, is not evidence, and must not be considered by you in deciding the case. You're absolutely bound to follow this instruction." App. 1359-60. Hornick contends that Malcom's outburst was unresponsive to defense counsel's question and insurmountably prejudicial. The Government argues that the testimony was not prejudicial enough to warrant a mistrial.

Three factors guide our review of a motion for a mistrial based on prejudicial comments. United States v. Riley, 621 F.3d 312, 336 (3d Cir. 2010). We examine "(1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court." Id. (quoting Lore, 430 F.3d at 207). As Malcom made only one passing allusion to *America's Most Wanted*, his testimony was hardly pronounced or persistent. Overwhelming evidence of Hornick's guilt supported the verdict, dampening the prejudicial impact of Malcom's comment. And the District Court took curative action by instructing the jury to disregard the comment. The court did not abuse its discretion in concluding that Malcom's remark, though inadmissible under Federal Rule of Evidence 404 and prejudicial, was not so prejudicial as to impugn the jury's verdict and necessitate retrial. See United States v. Baker, 432 F.3d 1189, 1219-20, 1225 (11th Cir. 2005) (holding that although testimony that the defendant appeared on *America's Most Wanted* should have been excluded, its admission was harmless error in light of the "avalanche" of inculpatory evidence); Ford v. Curtis, 277 F.3d 806, 811 (6th Cir. 2002) (same).

10

IV

Hornick next contends that the District Court erred in denying his pretrial motion to dismiss count 1 of the indictment as duplicitous. An indictment tainted by duplicity improperly joins distinct and separate offenses in a single count. United States v. Starks, 515 F.2d 112, 116 (3d Cir. 1975). We exercise plenary review over the legal question whether an indictment is duplicitous. United States v. Root, 585 F.3d 145, 150 (3d Cir. 2009). "'[I]n considering a defense motion to dismiss an indictment, the district court [must] accept[] as true the factual allegations set forth in the indictment.'" United States v. Bergrin, 650 F.3d 257, 265 (3d Cir. 2011) (quoting United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990)).

Count 1 charged Hornick with a single conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371. Named as coconspirators were Malcom, Ingardi, the Todisco brothers, and "others." The conspiracy allegedly operated from August 2001 to July 2007. Overt acts in furtherance of the conspiracy included 30 burglaries of retail stores in ten states. The indictment charged that Hornick and two individuals, "R.M. and R.M.M." (the Moran brothers), burglarized stores and transported the stolen goods across state lines until October 2002. Malcom allegedly purchased the stolen goods for resale. After authorities arrested the Moran brothers in August 2002, Hornick replaced them with Ingardi and the Todisco brothers. The indictment charged that Hornick, Ingardi, and the Todisco brothers likewise burglarized retail establishments and delivered stolen goods to Malcom.

11

Before trial, Hornick moved to dismiss count 1 on the basis that the charge was duplicitous. He contended that the indictment in fact charged two separate conspiracies: one between Hornick, Malcom, and the Moran brothers from August 2001 to October 2002, and a second between Hornick, Malcom, Ingardi, and the Todisco brothers from November 2002 to July 2007. The District Court denied the motion, concluding that the indictment charged one overarching conspiracy with a single object.

We evaluate three factors to determine "whether a group of individuals engaged in a single conspiracy or multiple conspiracies: . . . (1) 'whether there was a common goal among the conspirators'; (2) 'whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators'; and (3) 'the extent to which the participants overlap in the various dealings.'" United States v. Kemp, 500 F.3d 257, 287 (3d Cir. 2007) (quoting United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989)).

The indictment alleged that Hornick and his coconspirators shared the common objective of burglarizing retail stores and transporting the pilfered merchandise across state lines for resale on the black market. Both before and after October 2002, the indictment alleged, Hornick and his conspirators achieved the same result — burglary and resale of stolen goods — by using substantially the same method. In particular, both phases of the conspiracy relied on stolen vehicles, burglar's tools, and forcible entries. Finally, the indictment charged that the leader of the conspiracy (Hornick) and the fence (Malcom) remained constant, despite the substitution of auxiliary coconspirators. As all three factors indicate that count 1 charged the operation of a single conspiracy, the

12

District Court correctly concluded that the indictment was not duplicitous. See Kelly, 892 F.2d at 259 ("A single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in its membership.").[4]

V

Hornick's final claim is that the District Court vitiated his theory of the case by severing from the jury charge on count 1 evidence of burglaries he committed with the Moran brothers before October 2002. This modification, he argues, either amounted to a constructive amendment of the indictment or signified a variance between the single conspiracy charged and the evidence adduced at trial. In the alternative, he argues that the District Court abused its discretion by retroactively admitting the evidence of his dealings with the Moran brothers.

On February 18, 2010, after the parties rested, the District Court held a charge conference with the attorneys.[5] Defense counsel moved for a judgment of acquittal on

_____

[4] Hornick also argues that count 1 of the indictment does not comply with Fed. R. Crim. P. 7(c), which requires "a plain, concise and definite written statement of the essential facts constituting the offense charged." Count 1 is deficient, in Hornick's view, because it lists burglaries of 30 retail establishments as overt acts in furtherance of the conspiracy, but omits additional burglaries on which the Government relied to obtain a sentencing enhancement. Consequently, he reasons, it affords insufficient protection against future prosecution for the same crime. The argument is meritless. Spanning 11 pages, count 1 apprises Hornick of the elements of the offense and sets forth in great detail the factual predicate for the conspiracy charge. It demarcates the conspiracy temporally, providing Hornick with a clear basis on which to raise a double jeopardy defense in the event he is prosecuted again for the conspiracy. See United States v. Rankin, 870 F.2d 109, 112 (3d Cir. 1989) (setting forth test for judging the sufficiency of an indictment).

[5] No transcription or recording of the conference was prepared. The parties submitted, pursuant to Federal Rule of Appellate Procedure 10, a statement of proceedings describing the substance of the conference. Supplemental Appendix ("Supp. App.") 187-

13

count 1. Reviving the theory of his motion to dismiss, he argued that the evidence proved the existence of multiple conspiracies. And, he continued, the prejudicial variance between the indictment and the proof presented at trial justified directed acquittal on the charge. In the alternative, defense counsel requested a jury instruction on his multiple conspiracy theory. He planned to argue to the jury in summation that the evidence demonstrated the operation of two conspiracies, not a single conspiracy, and that acquittal was the proper remedy for the variance between the indictment and trial evidence.[6]

The District Court denied the motion for acquittal but "questioned the wisdom of presenting the jury with [the] unnecessary and potentially complex issue" of single versus multiple conspiracies. Supp. App. 189. Instead, the court proposed that the conspiracy charge exclude Hornick's dealings with the Moran brothers and begin at November 2002 rather than August 2001. That is, the Government could prove the conspiracy charge only on the basis of evidence of Hornick's interactions with Ingardi and the Todisco

90. We rely on the statement in recounting the court's decisions and the parties' positions and objections.

[6] On February 17, 2010, the day before the charge conference, the District Court distributed a proposed jury charge that included a multiple conspiracy instruction. Paragraph 83, titled "Conspiracy – Single or Multiple," provided

> [T]he indictment charges that Scott Hornick and the other alleged co-conspirators were all members of one single conspiracy to commit the offense of interstate transportation of stolen property. Scott Hornick has argued that there were really two or more separate conspiracies: one between Scott Hornick, Sasha Janice Ingardi, Vallin Malcom, Jerry Todisco, and Anthony Todisco, to commit interstate transportation of stolen property, and another between Scott Hornick, Renee Maron and Orlando Maron [sic] to burglarize businesses. Whether a single conspiracy or multiple conspiracies exist is a question of fact that you must decide.

App. 133 ¶ 83. The District Court excised this language in the final jury charge.

14

brothers. Evidence admitted about Hornick's activities with the Moran brothers from August 2001 to October 2002 would not supply proof of a conspiracy, but would be admitted as proof of state of mind, knowledge, intent, motive, opportunity, preparation, plan, or absence of mistake under Federal Rule of Evidence 404(b).

The Government acceded to the proposal. Defense counsel wished to confer with Hornick before deciding whether to object to the modified charge, but noted that constricting the charge in this fashion would obviate his request for an instruction on multiple conspiracies. The following day, the District Court charged the jury according to its revised instruction. App. 1342-48. "Count 1 of the indictment," the court instructed, "charges that in or about November 2002 and continuing through on or about July 27th, 2007, . . . the Defendant agreed or conspired . . . to commit . . . interstate transportation of stolen property." Id. at 1342. After the jury retired, defense counsel objected to the revised conspiracy charge. He also objected that, if the Moran brothers evidence was no longer proof of the conspiracy, that evidence should have been excluded under Federal Rule of Evidence 404(b). The District Court overruled the objections.

A

Hornick argues that by cropping the time frame of the conspiracy, the District Court constructively amended count 1 of the indictment in violation of the Grand Jury Clause of the Fifth Amendment.[7] "An indictment is constructively amended when, in the

_____

[7] The Grand Jury Clause provides, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentation or indictment of a Grand Jury." U.S. Const. art. V. The prohibition against constructive amendments derives from the clause. United States v. Miller, 471 U.S. 130, 136-37 (1985).

15

absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." United States v. Daraio, 445 F.3d 253, 259-60 (3d Cir. 2006) (citing United States v. Miller, 471 U.S. 130, 140 (1985)). "We exercise plenary review in determining whether there was a constructive amendment of the indictment." Id. at 259.

In reviewing a claim of constructive amendment, the "key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." Id. at 260. An indictment is constructively amended when trial evidence and jury instructions broaden the possible bases for conviction beyond those charged in the indictment. Miller, 471 U.S. at 138-39; United States v. Vosburgh, 602 F.3d 512, 532 (3d Cir. 2010). When trial evidence and jury instructions narrow the scope of evidence that may be used to prove an offense charged in the indictment, there is no constructive amendment. Miller, 471 U.S. at 138-39; United States v. Castro, 776 F.2d 1118, 1123 (3d Cir. 1985).

Count 1 of the indictment charged Hornick with conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371. It is undisputed that Hornick was tried on that offense and the District Court thoroughly and accurately charged the jury on the elements of offense. Nor did the jury hear evidence that fell beyond the scope of the conspiracy charge.

Hornick argues that the District Court constructively amended the charge by narrowing the time span of the conspiracy in the jury instructions. The argument is

16

foreclosed, however, by United States v. Miller, in which the Supreme Court held that "a conviction for a criminal plan narrower than, but fully included within, the plan set forth in the indictment" is not a constructive amendment. 471 U.S. at 138; see also Salinger v. United States, 272 U.S. 542, 548-49 (1926). The District Court eliminated evidence that could support a conspiracy conviction; it did not add a new offense or new evidence to the charge. This case falls squarely within Miller's holding that, "[a]s long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges . . . other means of committing the same crime." Miller, 471 U.S. at 136.

B

1

Hornick next argues that the evidence proffered at trial impermissibly and prejudicially varied from the single conspiracy charged in the indictment. "Where a single conspiracy is alleged in the indictment, there is a variance if the evidence at trial proves only the existence of multiple conspiracies." Kelly, 892 F.2d at 258. Animated by notice and fairness concerns, the variance rule stems from the Due Process Clause of the Fifth Amendment and, unlike the constructive amendment rule, contains a prejudice requirement. Kotteakos v. United States, 328 U.S. 750, 757-58 (1946); Daraio, 445 F.3d at 261-62. To establish reversible error based on a variance, a defendant must show "first, that there was such a variance and, second, that the variance prejudiced one of his substantial rights." United States v. Quintero, 38 F.3d 1317, 1337 (3d Cir. 1994).

To determine whether there was a variance, we return to the three factors set forth in United States v. Kelly, set forth in section IV. Whereas before our review trained only on the indictment, we now review the entire trial record to determine if the conspirators sought a common end, contemplated a continuous result, and overlapped in various dealings. Kelly, 892 F.2d at 259. In considering these factors, we are mindful that "a finding of a master conspiracy with sub-schemes does not constitute a finding of multiple, unrelated conspiracies." United States v. Smith, 789 F.2d 196, 200 (3d Cir. 1986). "We exercise plenary review over 'whether there was sufficient evidence from which the jury could have concluded that the government proved the single conspiracy alleged in the indictment.'" United States v. Lee, 359 F.3d 194, 207 (3d Cir. 2004) (quoting Kelly, 892 F.2d at 258).

While our scope of review is broader, our conclusion on the multiple conspiracy question remains unchanged. Hornick, testimony revealed, led one unified conspiracy that existed to burglarize retail establishments in different states and transport the stolen goods to Pennsylvania for resale on the black market. All coconspirators — the Moran brothers, the Todisco brothers, Ingardi, and Malcom — shared this common goal. The subtraction of the Moran brothers and addition of the Todisco brothers and Ingardi did not change the objective; rather, Hornick slotted his new collaborators into a well-oiled scheme. See Kelly, 892 F.2d at 259 ("Although the various personnel changed during the [conspiracy], the central purpose was constant and pervasive.").

Nor did the nature of the scheme and the result change in November 2002. Precision and constancy characterized Hornick's burglary method in both phases of the

18

conspiracy. Business targets were high-end camera or electronics stores and occasionally included pharmacies, perfume stores, and guitar stores. App. 205-06. The burglars made entry into stores through a rear or side entrance, most often with a crowbar, in the hours between midnight and sunrise. Id. at 206, 510, 519-20, 639-40, 932. They wore dark clothing, facemasks, and latex gloves to guard against telltale fingerprints. Id. at 206-07, 464, 506-07. Per Hornick's "60-second rule," the conspirators remained in stores no longer than 60 seconds, sweeping as many items into heavy-duty trash bags as time would allow. Id. at 506-07. Hornick alone brought the spoils to Malcom and received from him 30 to 50 percent their retail value in cash. Id. at 623, 765, 931, 1066, 1072. Burglaries with the Moran brothers and with the Todisco brothers and Ingardi shared these common features. Id. at 464, 506-07, 639-40, 746-48, 752-53, 757-58, 931-32.

The principal players in the conspiracy remained unchanged from August 2001 to July 2007. Hornick was "definitely the brains of the outfit," the unquestioned leader of the group and manipulator of his colleagues. Id. at 270-71, 688, 701. He lured Ingardi and the Todisco brothers into participation, instructed them on how to conduct burglaries, and chose target stores. During burglaries, he was the first one in and the last one out. Id. at 538. No one exited until Hornick announced that 60 seconds had elapsed. Id. at 759. He chastised his collaborators when they grabbed merchandise that would not yield a high return. Id. at 531, 601. Malcom, the other indispensable cog in the machine, was the fence in both phases of the conspiracy, paying Hornick for the stolen goods and then reselling those items to flea market vendors. The other conspirators enabled Hornick and Malcom to make more money; they were not essential participants. See United States v.

19

Boyd, 595 F.2d 120, 123 (3d Cir. 1978) ("[T]he government, without committing a variance, . . . may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan.").[8]

The evidence showed that both phases of the conspiracy not only were related, but also were indistinguishable aside from the membership change. From 2001 to 2007, the scheme had one goal, one method, and one outcome. The indictment alleged a single conspiracy, and the proof presented at trial showed the continuous operation of one overarching plan. We therefore conclude that each component of the three-part test supports the finding of a single conspiracy, and we reject Hornick's argument that there was an impermissible variance between the indictment and evidence proved at trial.[9]

2

Though he does not press the argument explicitly, lurking in Hornick's appeal is an objection to the District Court's refusal to charge the jury on multiple conspiracies. Hornick insists that the District Court's compartmentalization of the Moran brothers evidence signifies that the "trial judge believed, after hearing the evidence, that the Moran brothers conduct with [Hornick] constituted a separate conspiracy." Hornick Br.

---

[8] Hornick offers no argument as to how the evidence proved multiple conspiracies. His sole objection is that he lacked notice of the charges lodged against him. Hornick Br. 54. He is mistaken. The indictment clearly charges a single conspiracy and delimits the conspiracy temporally.

[9] Because we find no variance, we need not address whether Hornick was prejudiced.

20

Why else, he intimates, would the court take the question from the jury? The argument has superficial appeal, but closer analysis shows that Hornick has it backwards.

The District Court's denial of Hornick's motion for judgment for acquittal signifies its determination that a reasonable jury *could* find a single, ongoing conspiracy. Having rejected the theory that the evidence proved multiple conspiracies as a matter of law, the District Court had two options. It could charge the jury on multiple conspiracies or it could conclude that no reasonable jury could discern the operation of multiple conspiracies. Which course to follow, of course, depends on the evidence. We have explained that, as a general matter, "[t]he issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." United States v. Perez, 280 F.3d 318, 346 (3d Cir. 2002) (citing United States v. Curran, 20 F.3d 560, 572 (3d Cir. 1994)). However, "a district court can properly refuse a defendant's request for a jury instruction on single versus multiple conspiracies if there is insufficient evidence to support such an instruction." United States v. Greenidge, 495 F.3d 85, 93 (3d Cir. 2007) (citing United States v. Barr, 963 F.2d 641, 650 (3d Cir. 1992)).

The question, then, is whether there was insufficient evidence to support a multiple conspiracy instruction. As discussed, the evidence did not reveal the operation of multiple conspiracies. And because the evidence "did not demonstrate the existence of 'separate, independent networks,' but rather, as the indictment charged, a single conspiracy," the District Court's rejection of Hornick's request for a multiple conspiracy instruction was not improper. Greenidge, 495 F.3d at 95 (quoting Barr, 963 F.2d at 650).

21

Underlying the District Court's rejection of the multiple conspiracy instruction was the concern that the jury not be confused by the "unnecessary and potentially complex issue" of single versus multiple conspiracies. Supp. App. 189. In United States v. Barr, we encountered the same rationale for a District Court's rejection of a multiple conspiracy instruction. 963 F.2d at 650. We found this reasoning sound in view of the dearth of evidence of separate independent networks. Id. So, too, it is here.

C

Hornick's final claim is that even if the exclusion of the Moran brothers evidence from the proof of the conspiracy was not a constructive amendment and did not signify a variance, it was error to admit the evidence retroactively under Fed. R. Evid. 404(b).[10] After the District Court concluded that a multiple conspiracy charge was unnecessary and confusing, it instructed the jury that the Moran brothers evidence was not proof of the conspiracy charged in count 1. However, the jury could consider the evidence

> for the purpose of deciding whether the Defendant had the state of mind, knowledge, or intent necessary to commit the crime charged in the indictment, had a motive or opportunity to commit the acts charged in the indictment, was preparing or planning to commit the acts charged in the indictment, acted with a method of operation as evidenced by unique pattern of committing burglaries, or did not commit the acts for which the Defendant is on trial by accident or mistake.

---

[10] Federal Rule of Evidence 404(b) provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2). Upon the defendant's request, the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial." Id. 404(b)(2)(A).

App. 1347-48. The court warned, "Do not consider this evidence for any other purpose. . . . [Y]ou may not use this evidence to conclude that . . . because a Defendant may have committed other acts he must also have committed the acts charged in the indictment." Id. We review *de novo* the question whether the Moran brothers evidence falls within the scope of Rule 404(b). United States v. Green, 617 F.3d 233, 239 (3d Cir. 2010).

"To be admissible under Rule 404(b), evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it." Id. at 249. There is no dispute that the evidence was relevant and was accompanied by a limiting instruction. Instead, Hornick argues that the evidence had no proper evidentiary purpose and did not satisfy Rule 403.

We agree with the Government that the evidence concerning Hornick's dealings with the Moran brothers had a proper evidentiary purpose. "A proper purpose is one that is 'probative of a material issue other than character.'" Id. at 250 (quoting Huddleston v. United States, 485 U.S. 681, 686 (1988)). The evidence of Hornick's October 2002 arrest and confession was proof of motive, for Hornick explained to officers that he committed burglaries with the Moran brothers "for a living." App. 232. The evidence concerning the Circuit City burglary that preceded Hornick's October 2002 arrest was proof of a distinctive method of operation. Detective Sergeant Matthew Dox, an officer with the Wayne, New Jersey Police, testified that officers recovered, among other things, three crowbars, latex gloves, plastic bags, and a dust mask from the scene of the crime. Id. at 464. These items were hallmarks of Hornick's burglaries and helped establish the

23

distinctiveness of the plan underlying the conspiracy and subsequent burglaries. And Malcom's testimony about his interactions with Hornick both before and after October 2002 helped to establish Hornick's intent to join the conspiracy and opportunity to participate in the conspiracy.

We find no error in the District Court's calculus under Federal Rule of Evidence 403. The Rule empowers a trial judge to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. "We review for abuse of discretion, which means we must uphold the District Court unless its ruling was arbitrary or irrational." Green, 617 F.3d at 251-52 (quotation marks omitted). The District Court did not abuse its discretion in permitting the jury to consider the evidence for the purposes stated in the jury instruction. While there was some risk that the evidence would be unfairly prejudicial, the evidence also carried significant probative value.

## VI

For the foregoing reasons, we will affirm the judgment of the District Court.

24